**STERLING DISTRIBUTORS, INC.,** Appellant,

v.

**UNITED STATES of America,** Appellee.

No. 19393.

United States Court of Appeals Fifth Circuit.

Feb. 13, 1963.

D. H. Markstein, Jr., Birmingham, Ala., Markstein & Cain, Birmingham, Ala., of counsel, for appellant.

Macon L. Weaver, U. S. Atty., Birmingham, Ala., John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Michael I. Smith, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before RIVES, JONES and WISDOM, Circuit Judges.

JONES, Circuit Judge.

An accumulated earnings tax was imposed against the appellant, Sterling Dis-

tributors, Inc., under the provisions of Sections 531–537 of the Internal Revenue Code of 1954. A deficiency having been assessed and paid for the years 1957 and 1958, the taxpayer sued for a refund. The district court found for the taxpayer as to the 1957 tax and for the Government as to the 1958 tax. On this appeal we decide whether the district court was in error in sustaining the Commissioner's determination that the taxpayer accumulated earnings in 1958 for the purpose of avoiding income tax with respect to its shareholders by failing to pay dividends.

The taxpayer began operating in 1940. Its business is the distribution of beer. Its place of business is Birmingham, Alabama. In 1957 and 1958 the outstanding shares of the stock of the taxpayer were held as follows:

| | |
|---|---|
| Sam Nakos | 40 shares |
| Agatha Nakos, Sam Nakos' Wife | 30 shares |
| Alex Nakos, Sam Nakos' brother | 20 shares |
| Sergei Kampakis, Sam Nakos' cousin | 5 shares |
| Chris Mitchell, Sam Nakos' son-in-law | 5 shares |

The operation of the taxpayer and the management of its business were almost entirely directed by Sam Nakos. Sterling Distributors was pretty much a one-man show. Sam Nakos started as a beer distributor in the City of Birmingham when Alabama legalized the sale of beer in 1937. At that time he distributed Cook's beer which was brewed in Evansville, Indiana. In 1940 the representation of Cook's was lost by Nakos because of some misunderstanding although Cook's was then outselling every other beer in the Birmingham area. Nakos then arranged for the distribution of Sterling beer, also made in Evansville, Indiana, and the taxpayer corporation was organized to handle it. Its product is a popular-priced beer as distinguished from a premium beer. It outsold every other beer in the Birmingham market for many years.

In April of 1957 the taxpayer became the distributor for Pabst beer, which is a premium-priced beer. The taking on of the Pabst line required the taxpayer to acquire more trucks, employ more personnel, carry a greater inventory and have a larger amount outstanding in receivables.

An election was scheduled to be held in Etowah County, Alabama, on February 18, 1958, under the Alabama local option law to determine whether the sale of beer would be permitted in the county. In 1957 the taxpayer was given an assurance that if the election resulted in permitting beer in Etowah County, it would have the distributorship for Sterling beer in the county. This operation would have required an investment of $50,000 to $75,000. The election failed to carry and the taxpayer's operations were not expanded into Etowah County.

The Birmingham warehouse of the taxpayer was too small and was otherwise inadequate for the needs of its business. In 1957 the necessity for improved warehousing was recognized and in October of 1958 a site was purchased for $110,000, of which $60,000 was then paid with the $50,000 payable a year later. Apparently no estimates were made as to the probable cost of the contemplated warehouse. The real estate agent who sold the site to the taxpayer represented that a rail siding could be built into the property. It developed later that the spur could not be brought onto the property. The time when this became known to the taxpayer is hereafter considered. When it was learned that trackage could not be made available, Sam Nakos stated that he wanted the property sold. He also said that he had to have a warehouse with a track. In 1959 an opportunity arose for erecting a building on the site and making a lease to a chain store for a supermarket and this was done.

Prior to and during 1958 the taxpayer had made demand loans to most of its stockholders and to Nakos Realty Company, owned by the Nakos family, and the loans had not been paid at the end of the

year 1958. At the end of the year salary and bonuses had accrued to some of the stockholders. The indebtedness to the taxpayer, the offsetting salary and bonus accruals, and the net amounts owing at the end of the year are as follows:

|  | Owed to Taxpayer | Salary & Bonus | Balance |
|---|---|---|---|
| Sam Nakos | $ 2,835.45 | 3,174.01 | None |
| Chris Mitchell | 18,188.82 | 3,500.00 | 14,688.82 |
| Sergei Kampakis | 1,272.68 | 2,300.00 | None |
| Alex Nakos | 6,634.34 | 4,500.00 | 2,134.34 |
| Nakos Realty Co. | 8,982.56 | None | 8,982.56 |
|  |  |  | $25,805.72 |

The loan to Mitchell was secured by a mortgage on his home. All of the loans to stockholders were paid in 1959.

The taxpayer owned, during the period involved, United States Treasury bonds of the par or face value of $45,000 which were deposited with public officials as a pledge to secure the payment of taxes. It owned municipal bonds of the par or face value of $3,000 which were not pledged.

The taxpayer declared no dividends in 1958. It declared a stock dividend in 1957. In 1954 a dividend of $15,000 was paid and in 1956 a dividend of $20,000 was paid.

At the close of the year 1958 the taxpayer's books showed the following:

| | |
|---|---|
| Cash in bank | $ 86,603.18 |
| Cash on hand | 41,106.16 |
| Merchandise inventory | 92,765.60 |
| Bonds | 47,426.34 |
| Accounts receivable | 62,273.86 |
| Returned checks | 4,519.59 |
| Furniture and fixtures | 5,023.77 |
| Delivery equipment | 7,327.85 |
| Building | 17,974.19 |
| Sales cars | 4,684.05 |
| Building improvements | 46.56 |
| Land | 99,772.73 |
| Meter deposits | 32.50 |
| Unexpired insurance | 1,495.38 |
| Unexpired licenses | 429.00 |
| | $471,480.76 |

| | |
|---|---|
| Accounts payable | 88,249.60 |
| Accrued taxes | 23,797.22 |
| Accrued rent | 3,614.83 |
| Accrued salaries | 27,370.62 |
| Federal income tax | 12,586.12 |
| Alabama income tax | 667.17 |
| Mortgage payable | 50,000.00 |
| Common stock | 10,000.00 |
| Reserve for palletizing | 40,000.00 |
| Earned surplus | 215,195.20 |
| | $471,480.76 |

The beer business is seasonal to a very considerable extent with the maximum business in the summer months and the minimum in the winter with the low point around the end of the year. Inventories, accounts receivable and accounts payable are considerably higher in the summer months, requiring considerably more working capital than during the winter season.

The cash-on-hand item on the books of the taxpayer represented only a comparatively small amount of cash and was comprised, for the most part, of customers' I.O.U.'s.

The personal relationship between Sam Nakos, the head of the family which owned the stock of the taxpayer corporation and the managing head of its operations, and the management of the company producing Sterling beer, Sterling Brewers, Inc., gave to the taxpayer credit terms

more favorable than was its general practice and than were generally granted in the trade. There was no reason to suppose that this favored treatment would continue if Sam Nakos ceased to occupy his position of management in the taxpayer corporation. There were reasons for assuming that it would not. As a fact, subsequently developed, it did not.

Sam Nakos had a heart attack on August 1, 1959. He was in the hospital for three weeks, confined to his home for six months and advised by his physician to restrict his business activities for a year. The plans for the expansion of the business were suspended, the plans for a new warehouse and the palletizing program were shelved, and Sterling Brewers curtailed the credit they had previously extended and required payment within seven to ten days after making shipments.

The district court, among other things, found as facts that accumulated earnings at the end of 1958 were $269,786.76; that the taxpayer had consistently maintained large bank balances; that substantial taxes were avoided by the principal stockholders by reason of the failure to declare dividends in 1958; that the taxpayer realized the necessity for a palletizing program but had no definite plans therefor in 1958 when new warehouse facilities were not available; and that the earnings and profits accumulated in 1958 were beyond the reasonable needs of the business. As a conclusion of law the district court determined that the taxpayer had accumulated earnings and profits in 1958 beyond the reasonable needs of the business.

■■ · Two observations may be made at the outset. First, whether there has been an unreasonable accumulation of earnings is to be determined by the conditions as they existed in the year involved and not by subsequent events except as such events may throw light upon the facts as existing during the tax year. Dixie, Inc. v. Commissioner, 2nd Cir., 1960, 277 F.2d 526; K O M A, Inc. v. Commissioner, 10th Cir., 1951, 189 F.2d 390; Reg. 1954–1960 § 1.537–1. Second, while the determination of the reasonableness of accumulations is a matter for

the Commissioner and the courts, the business judgment of those entrusted with the management of a successful and growing enterprise is not to be ignored. F. E. Watkins Motor Co. v. Commissioner, 31 T.C. 288.

■ We are unable to find in the record the evidence which justifies the finding that before the end of 1958 the taxpayer knew that it could not use its recently acquired warehouse site because of unavailability of trackage. There was, as the district court found, an imperative necessity of adopting a palletizing program which could only be done in a different warehouse than the one then being occupied. We do not think that the absence of an architect's design rendered uncertain or vague, within the meaning of Reg. § 1.157–1, the imperative need for a new warehouse and the carrying out of the palletizing program, as such need existed at the end of 1958. The deferment or abandonment, whichever it was, of these plans in 1959 upon the illness of Sam Nakos does not show that the retention of earnings for that purpose was, at the close of 1958, an unreasonable accumulation. Nor does the fact that, in a subsequent year, the site was leased for a use unrelated to taxpayer's business have any bearing on the need of the business in the tax year or the reasonableness of an accumulation to meet that need. Even though there was evidence to show knowledge of the taxpayer in 1958 that trackage could not be had at its warehouse site, this would not show that there was no plan for meeting the imperative need which the district court found existed. There was a need for a new and larger warehouse, with trackage, which would permit the installation of palletizing equipment and an intention that the need would be met in a regular course of business. This, in our view, was enough. Cf. Smoot Sand & Gravel Co. v. Commissioner, 4th Cir., 1959, 274 F.2d 495. The suggestion of counsel for the Government that the land should have been distributed in kind to the stockholders seems to us too unrealistic to require comment. The Government also says that the property

should have been sold in 1958 and the proceeds made available for distribution to stockholders. Although the record seems to be to the contrary, if it be assumed that the finding that the taxpayer knew that the site could not be used for its purposes is supported by evidence, the taxpayer would not be required to make a sale in the very short time then remaining in the year, and this would be true even if, as was not the case, the intention to go forward promptly with the warehousing and palletizing program had then been abandoned.

As has been noted, the cash account of the taxpayer in the amount of $41,106.16 was primarily customers' I.O.U.'s or other customer obligations which could not be charged to them as accounts receivable. The Government, in its brief, has said that these evidences of indebtedness could have been distributed in kind to stockholders. This proposal requires neither consideration nor discussion.

■■■■ If the payment of a dividend would leave a corporate taxpayer with insufficient working capital, it follows that the failure to pay a dividend does not result in an unreasonable accumulation of income. The Tax Court, as it has said, "has consistently held that the accumulation of funds to meet operation expenses for at least 1 year is reasonable." F. E. Watkins Motor Co. v. Commissioner, supra, Note 7. The operating expense of the taxpayer for 1958 was $399,719.81. The capital was $10,000.00 and surplus at the end of the year was $255,195.20. It has been said that the Tax Court rule is a rule of thumb and one which does not necessarily control with respect to the needs of a particular business. Dixie, Inc. v. Commissioner, 2nd Cir., 1960, 277 F.2d 526. Yet it would seem that the rule of thumb would have some weight when the surplus was less than two-thirds of the annual operating cost. The Internal Revenue agent who made the tax examination was a witness. He testified that he computed the taxpayer's quick assets at $349,286.29, with liabilities of $226,-972.28. Included in the quick-asset figure was the value of the bonds pledged for

taxes. Quick assets are those which in the ordinary course of business will be converted into cash or which can be quickly realized upon without sacrifice. These bonds were pledged to governmental agencies and, as was found by the district court, were not available for dividends. They should not have been included with quick assets. Eliminating the bonds, the quick-asset figure, as determined by the Government, would be reduced by $47,-426.34 to the amount of $301,859.95. The ratio of quick assets to quick liabilities is about 1.33 to 1. There is no substantial difference, at least for our purposes here, between quick assets and quick liabilities on the one hand and current assets and liabilities on the other. See Whitman v. Webster, 8th Cir., 1941, 122 F.2d 860; In re American Knit Goods Mfg. Co., 2nd Cir., 1909, 97 C.C.A. 486, 173 F. 480. Credit men of the old school had the notion that an applicant for credit should show at least a two to one ratio between current assets and current liabilities. Munn, Encyclopedia of Banking and Finance. A currently accepted standard, applicable to distributors of liquors, wines and beer, fixes the acceptable ratio at 1.72 to 1. Robert Morris Associates, 1961 Statement Studies p. 109. The 1.33 to 1 ratio of the taxpayer falls short of either test, and the figures are as of December 31, 1958, at a time of year when inventory, accounts receivable and accounts payable are at their low for the year. The figures used by the Government agent in computing quick liabilities do not, apparently, include the $50,000.00 mortgage indebtedness. Since it was payable in less than a year after December 31, 1958, it should have been so included. If the figures be revised by including the $50,000.00 debt as a quick or current liability, the ratio becomes about 1.09 to 1. Measured by the working capital and ratio tests it seems that a finding of unreasonable accumulation is not justified. F. E. Watkins Motor Co. v. Commissioner, supra.

■■■ The Government stresses the evidence and findings relating to loans to stockholders as sustaining the conclusion

that there had been an unreasonable accumulation of earnings. But the evidence, to some extent, showed a bookkeeping system rather than obligations. Sam Nakos and his wife owned seventy per cent of the stock issued by the taxpayer. At the end of 1958 the taxpayer owed Sam Nakos as salary and bonus the sum of $3,174.01; a balance against the taxpayer of $338.56. The taxpayer owed Sergei Kampakis the sum of $1,027.32 above the amount it carried on its books as loans to him. The offsets of Alex Nakos accounts showed a balance of $2,134.34 in the taxpayer's favor. Except as to Chris Mitchell, the aggregate of the stockholders' indebtedness to the taxpayer was less than $800.00. These small loans, offset for the most part by obligations of the taxpayer, were not of the kind or amount which are evidence of a purpose to make earnings available to stockholders without the declaration of dividends. The repayment in 1959 shows that the advances were not in lieu of dividends. The loan to Chris Mitchell, a five per cent. stockholder, was of a larger amount. He borrowed $25,000.00, of which $18,188.22 was owing at the close of 1958, to finance the purchase of a $35,000.00 home. The loan was payable on demand and secured by a mortgage. It was repaid in 1959. The borrowing was made from the taxpayer because it could be had without interest. It was not an investment by the taxpayer nor can it be regarded as a payment in lieu of a dividend. The overall loan pattern here is wholly incompatible with the purpose to get the equivalent of a dividend under another guise. See Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346. Neither the loan to Mitchell nor the loan of $8,932.56 to Nakos Realty Company establishes either the purpose or result of a manipulation of the taxpayer's business and finances of unreasonably accumulating earnings. A comparison of the facts of this case with those sustaining the imposition of the tax will point up the differences which, we think, require judgment here for the taxpayer. Cf. Helvering v. National Grocery Co., supra; K

O M A, Inc. v. Commissioner, supra; Wilkerson Daily Corporation v. Commissioner, 9th Cir., 1942, 125 F.2d 998; United Business Corporation v. Commissioner, 2nd Cir., 1933, 62 F.2d 754.

It is our conclusion that the findings and conclusions of the district court do not find support in the record and that its judgment is clearly erroneous. In a footnote to its findings of fact and conclusions of law the district court recited that it had been aided by an article appearing in 39 Taxes 402. We have carefully considered the article and the authorities cited in it. We are not persuaded by it that our conclusions are incorrect. A judgment for the appellant should be entered for the amount, with interest, of the accumulated earnings tax assessed against it for the year 1958. So that this may be done the judgment of the district court is reversed and the cause is remanded.

Reversed and remanded.