Mimmac Corporation v. Commissioner.
Mimmac Corp. v. Commissioner
Docket No. 6188-69.
United States Tax Court
T.C. Memo 1972-96; 1972 Tax Ct. Memo LEXIS 161; 31 T.C.M. (CCH) 375; T.C.M. (RIA) 72096; April 26, 1972, Filed. Jules Silk and Harvey N. Shapiro, 1510 Fidelity Trust Bldg., Philadelphia, Pa., for the petitioner. Giles J. McCarthy, for the respondent. SCOTT Memorandum Finding of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the calendar years and in the amounts as follows: Year
Deficiency
1966
$ 5,846.32
1967
15,846.51
Two of the issues raised by the pleadings have been conceded by respondent, leaving for our decision only the issue of whether, for each of the years 1966 and *163 1967, petitioner is subject to the accumulated earnings tax imposed by section 531, I.R.C. 1954, [1] because of being availed of for the purpose of avoiding income taxes with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Petitioner, Mimmac Corporation (formerly F. D. McCarthy, Inc.), is a New Jersey corporation with its principal place of business at the time of the filing of the petition in this case in Absecon, New Jersey. Petitioner was incorporated on August 25, 1961, under the name of F. D. McCarthy, Inc., and on April 18, 1967, its name was changed to Mimmac Corporation. It kept its books and records on an accrual method of accounting, and filed its Federal income tax returns for the calendar years 1962 through 1970 with the district director of internal revenue, Newark, New Jersey. Petitioner was engaged in the business of asphalt paving of roads, streets, driveways and public roads from the date of its incorporation until April 1967, at which time it sold all its operating assets and ceased all actual operations other *164 than investments. Petitioner's officers and shareholders from the date of incorporation to and including the years in issue were as follows: Number of
issued and
outstanding
Name
Office
shares owned
Franklin D. McCarthy
President
100
Marie McCarthy
Secretary
100
Ralph Bartlett
Treasurer
1
Total
201
Franklin D. McCarthy (hereinafter sometimes referred to as McCarthy) and Marie McCarthy, husband and wife, filed their joint Federal income tax returns for the 376 calendar years 1966 and 1967 on the cash method of accounting with the district director of internal revenut at Newark, New Jersey. McCarthy was born on November 4, 1900. Prior to the incorporation of petitioner, he had operated a road paving business as a sole proprietorship for a number of years. In January 1962 McCarthy and his wife transferred the assets of the proprietorship, consisting of trucks, graders, and other automotive vehicles to petitioner in exchange for 200 shares of petitioner's stock. In its road paving activities, petitioner operated primarily between April 1 and November 30 of each year since weather conditions in New Jersey were unfavorable *165 for paving roads between December 1 and March 31. In late 1965 or early 1966, McCarthy began developing a cataract on his left eye. In 1966 McCarthy gave some thought to disposing of the paving business operated by petitioner and in December of that year entered into negotiations with John and Gerald Barrett (hereinafter referred to as the Barrett Brothers) for the sale to them of petitioner's operating assets. The discussions between McCarthy and the Barrett Brothers in December 1966 failed to result in the sale of petitioner's assets. McCarthy found the proposed terms of the sale, whereby the purchasers would make installment payments over a period of several years, unacceptable. In late December 1966 McCarthy went to Florida on a vacation and returned to Absecon, New Jersey on March 6, 1967. Upon his return in March 1967, McCarthy consulted with his doctor who informed him that it was advisable to operate on the cataract on his left eye. In March 1967, McCarthy renewed his negotiations with the Barrett Brothers. The negotiations resulted in an offer by the Barretts to purchase the operating assets of petitioner for $108,000. On April 7, 1967, the board of directors of *166 petitioner authorized by resolution, the change of name of petitioner to Mimmac Corporation, the sale of its operating assets to Gerald A. Barrett and John M. Barrett, and the complete liquidation of petitioner. On the same date, a special meeting of petitioner's stockholders approved the resolutions for the change of name, sale of operating assets and liquidation of petitioner. In April 1967 petitioner sold its operating assets to Gerald A. Barrett and John M. Barrett for $108,000. Petitioner was not liquidated, but since the date of sale of its operating assets, petitioner had not been engaged in the operation of an active business. The contract of sale between the Barrett Brothers and petitioner provided that petitioner corporation would not reestablish or become engaged in the same or a similar business within a radius of 30 miles of Absecon, New Jersey for a period of 2 years. Following the sale of petitioner's operating assets to the Barrett Brothers, McCarthy was employed by and worked for the purchasers until the 8th or 9th of July 1967. In July 1967 McCarthy underwent an operation for removal of the cataract on his left eye. The operation performed on McCarthy for *167 removal of the cataract in July 1967 was a success. On October 4, 1967, the doctor who performed the operation was of the opinion that McCarthy's vision was normal. McCarthy saw this doctor in November and December of 1967, and though McCarthy's vision was progressively worsening the doctor was still of the opinion that the operation had been a success. Throughout 1968 McCarthy continued to see the doctor who had performed the operation but his vision became worse and worse. On November 29, 1968, upon examination of McCarthy's eye, this doctor concluded that McCarthy had a detached retina and that without surgery, the detached retina would result in McCarthy's total loss of sight in his left eye. McCarthy was operated on for the detached retina in December 1968. Following his operation for the detached retina, McCarthy's vision was still impaired. During 1969 he continually revisited the doctor in an effort to obtain contact lenses to correct his vision. However, it was not until the summer of 1971 that the doctor was able to provide a prescription that enabled him to see satisfactorily. McCarthy did not consider the covenant not to compete within a 30-mile radius of Absecon, *168 New Jersey as precluding petitioner from resuming operations beyond that geographical area within 2 years of the sale of petitioner's [assets] to the Barrett brothers. Because of his continued problem with the vision in his left eye, McCarthy did not engage in the paving business through petitioner or in any other manner 377 after July 1967 and at the time of the trial of this case had not resumed any paving business operations. McCarthy was of the opinion that should petitioner resume an active paying business, it would require the following equipment at the approximate cost indicated: Equipment
Approximate cost
Grader
$25,000
Paver
25,000
Rollers (2)
25,000
Pick-up truck
2,500
Small tools
2,000
Tractor
4,000
Trailer
12,000
Total
$95,500 In addition, McCarthy was of the opinion that petitioner would need sufficient working capital to enable it to resume its operations. As a result of his experiences in the paving business during the depression years of the 1930's, McCarthy felt that it was necessary for a corporation to maintain a strong financial position. He also deemed a strong financial position as advantageous in getting state *169 anl local contracts and obtaining performance bonds from the bonding companies. McCarthy and his wife were reluctant to borrow money. However, in 1965 petitioner borrowed $30,000 to post the 10 percent required by the State of New Jersey along with its bid for paving work on the Garden State Parkway. [2]
*170 Petitioner's operations in the asphalt paving business were never actually resumed. In the taxable years 1968 through 1970 petitioner filed personal holding company returns based upon its income from investments. Distributions of personal holding company income in those years relieved petitioner from any liability for the personal holding company tax under section 541. Petitioner's net profits (before Federal income taxes) for the taxable years 1962 to 1967, inclusive, were as follows: Net Profit
before Federal
Year
income taxes
1962
$26,057.13
1963
24,311.60
1964
35,369.79
1965
36,098.27
1966
38,652.19
1967
98,364.20
The following schedule sets forth petitioners's balance sheets for the taxable years 1962 to 1967, inclusive: Current assets
1962
1963
1964
Cash
$31,845.34
$52,124.29
$ 72,073.17
Accounts receivable
14,887.16
7,225.20
55,788.98
Certified checks
900.00
3,600.00
Investments in govt.
oblig.
Other current assets
50.00
720.00
Total current assets
46,732.50
60,299.49
132,182.15
Bldg. & other dep. assets
30,003.23
32,903.23
40,824.51
Less accumulated
6,643.47
15,906.27
18,985.78
depreciation
Net book value
23,359.76
16,996.96
21,838.73
Land
500.00
500.00
500.00
Other assets
1,200.18
1,685.08
1,893.84
Total assets
71,792.44
79,481.53
156,414.72
Current liabilities
Accounts payable
6,939.14
2,317.54
24,067.00
Notes pay. less than 1
8,000.00
5,597.46
8,275.00
year
Other current liabilities
10,561.32
11,313.84
21,056.19
Loans from stockholders
15,475.40
Other liabilities
11,888.76
8,831.35
11,048.73
Total current liabilities
37,389.22
28,060.19
79,922.32
Capital stock - common
16,395.80
16,395.80
16,395.80
Earnings and surplus
18,007.42
35,025.54
60,096.60
Total
$71,792.44
$79,481.53
$156,414.72
*171 Current assets
1965
1966
1967
Cash
$ 70,044.50
$ 60,206.00
$ 4,630.66
Accounts receivable
70,947.19
44,564.11
Certified checks
1,400.00
Investments in govt.
50,000.00
73,931.50
[1] 223,639.07
oblig.
Other current assets
1,263.75
4,300.40
Total current assets
193,655.44
183,002.01
228,269.73
Bldg. & other dep. assets
47,815.52
48,422.98
5,636.77
Less accumulated
25,235.70
27,850.24
3,770.12
depreciation
Net book value
22,579.82
20,572.74
1,866.65
Land
500.00
500.00
Other assets
1,931.58
3,008.49
Total assets
218,666.84
204,074.75
233,144.87
Current liabilities
Accounts payable
80,143.32
28,441.69
Notes pay. less than 1
year
Other current liabilities
19,073.67
46,705.17
Loans from stockholders
6,000.00
Other liabilities
11,121.10
28,470.83
Total current liabilities
116,338.09
75,146.86
28,470.83
Capital stock - common
16,395.80
16,395.80
16,395.80
Earnings and surplus
85,932.95
112,532.09
188,278.14
Total
$218,666.84
$204,074.75
$233,144.87[sic 378 Petitioner's earned surplus and *172 undivided profits for the years 1962 to 1967, inclusive, and annual increases therein were as follows (per tax returns): Earned surplus and
Year
undivided profits
Increase
1962
$ 18,007.42
1963
35,025.54
$17,018.12
1964
60,096.60
25,071.06
1965
85,932.95
25,836.35
1966
112,532.09
26,599.14
1967
188,278.14
75,746.05
From its original incorporation in 1961 to and including the taxable year 1967, petitioner has never declared or paid any cash dividends. The current assets, current liabilities and ratio of current assets to current liabilities of petitioner for the years 1962 through 1967 are as follows: 1962
1963
1964
Current assets
$46,732.50
$60,299.49
$132,182.15
Current liabilities
37,389.22
28,060.19
79,922.32
Ratio of current assets to current
1.24 to 1
2.14 to 1
1.64 to 1
liabilities
1965
1966
1967
Current assets
$193,655.44
$183,002.01
$228,269.73
Current liabilities
116,338.09
75,146.86
28,470.83
Ratio of current assets to current
1.66 to 1
2.43 to 1
8 to 1
liabilities
The available working capital (current *173 assets less current liabilities) of petitioner at the close of its taxable years 1965 through 1967 was as follows: Available
Date
working capital
December 31, 1965
$ 77,317.35
December 31, 1966
107,855.15
December 31, 1967
199,798.90
Petitioner carried no inventory. In its road paving activities, petitioner had materials, consisting mostly of asphalt, delivered directly to the job site by the supplier. The job site was the particular specified area where petitioner had contracted to pave roads. The following schedule sets forth petitioner's cash receipts from contracts and cash disbursements for operating expenses in each month of 1966 except that for this purpose the months of January, February, and March have been combined. [3]
Cash
disbursements
Cash receipts
for operat-
Month
from contracts
ing expenses
January, February and March
$64,749.14
$78,174.56
April
48,756.10
49,562.37
May
10,864.90
6,428.86
June
39,861.46
16,031.18
July
5 3,811.42
51,324.99
August
29,871.73
5,236.85
September
11,454.70
30,726.31
October
18,414.85
22,480.04
November
25,291.40
18,895.08
December
53,679.50
44,782.51
*174 Petitioner's opening monthly balance of cash and of investments during the taxable year 1966 was as follows: Date
Cash balance
Investments
Total
January 1, 1966
$70,044.50
$50,000.00
$120,044.50
February 1, 1966
56,307.41
50,000.00
106,307.41
March 1, 1966
56,307.41
50,000.00
106,307.41
April 1, 1966
36,502.25
50,000.00
86,502.25
May 1, 1966 [1]
33,113.05
49,892.08
83,006.13[ sic]
June 1, 1966
37,563.71
49,892.08
87,455.79
July 1, 1966
64,017.62
49,892.08
113,909.70
August 1, 1966
60,996.39
49,892.08
110,888.47
September 1, 1966
70,974.15
49,892.08
120,866.23
October 1, 1966
42,127.69
73,931.50
116,059.19
November 1, 1966 [2]
26,819.27
73,931.50
100,750.77
December 1, 1966
31,510.16
73,931.50
105,441.66 379 Of 48 invoices submitted in the taxable year 1966 totaling $52,151.98, the average time between the date of the invoice and the date of payment was approximately 30 days. A sample *175 of the 10 invoices of larger jobs contracted by petitioner reflects an average period of 25 days between the time that work was commenced and the date of completion. However, there was no necessary correlation between the time elapsed between the dates of commencement and completion and the actual number of days worked on a job. Of the 10 sample invoices the average time elapsed between the date of invoice and the date of payment was approximately 45 days. In its operation, petitioner sought the award of contracts from the state or local governments. In order to bid on state jobs, petitioner was required to submit a financial statement to the state every 6 months. In addition, petitioner was required to submit financial statements to the bonding company which posted the bond guaranteeing performance by petitioner on state jobs. Petitioner was required to submit certified checks with its bids, when bidding on paving jobs for state or local governments, in an amount equal to 10 percent of its bid. The following schedule reflects the disbursement and receipt of certified checks by petitioner during 1966, accompanying bids on government jobs. Date of
disbursement by
Date of receipt by
Amount
F. D. McCarthy, Inc.
Recipient of check
F. D. McCarthy, Inc.
$ 1,400
10/25/65
Ventnor City, N.J.
1/14/66
5,000
4/19/66
Joseph Motley, Treasurer
4/19/66
500
7/26/66
George Keepel
7/27/66
4,500
8/ 9/66
Ocean City, N.J.
8/10/66
700
8/11/66
Egg Harbor, N.J.
8/12/66
3,000
8/22/66
Margate City, N.J.
8/26/66
3,000
9/ 1/66
Margate City, N.J.
9/ 1/66
2,000
10/ 5/66
Brigantine, N.J.
10/ 5/66
2,500
10/ 5/66
Brigantine, N.J.
11/10/66
3,000
10/17/66
City of P'ville, N.J.
10/18/66
2,000
10/17/66 hLongport,
10/20/66
N.J.
2,000
10/24/66
Ventnor City, N.J.
11/ 9/66
500
11/ 2/66
Brigantine, N.J.
11/28/66
700
11/10/66
City of Port Republic, N.J.
11/14/67
*176 $30,800 The average time lag between issuance and return of certified checks was 38 days. On their income tax returns for the taxable years 1966 and 1967, Franklin D. McCarthy and Marie McCarthy, his wife, reported the following taxable income and tax liability: 1966
1967
Taxable income
$43,801.00
$42,508.55
Tax liability
13,964.00
13,344.10
If petitioner had distributed its current earnings and profits in the taxable years 1966 and 1967, the increase in taxable income and tax liability of Franklin D. McCarthy and Marie McCarthy, his wife, would have been as follows: 1966
1967
Taxable income reported
$43,801.00
$42,508.55
Add: Amount subject to accumulated earnings tax
12,532.09
25,727.60
Taxable income if dividends paid
$56,333.09
$68,236.15
Tax liability per return
$13,964.00
$13,344.10
Tax liability on $56,333.09
$20,356.54
Tax liability on $68,236.15
$26,749.88
On July 11, 1969, prior to the mailing of the notice of deficiency, respondent mailed to petitioner by certified mail notifications under section 534(b) that the proposed notice of deficiency included an amount with respect *177 to the accumulated earnings tax imposed by section 531 for the taxable years 1966 and 1967. Petitioner did not submit statements for either the taxable year 1966 or the taxable year 1967 within the period allowed by the regulations promulgated under section 534(c). Respondent in his notice of deficiency determined that petitioner was liable for the accumulated earnings tax imposed by section 531 for each of the years in issue. 380 Opinion Section 531[4] imposes an accumulated earnings tax on corporations (described in section 532) "formed or availed of for the purpose" of avoiding the income tax as to its shareholders by permitting earnings and profits to accumulate rather than being divided or distributed. Section 533 provides that the fact that earnings and profits are permitted to accumulate "beyond the reasonable needs of the business" shall be determinative of the purpose to avoid income tax of its shareholders unless petitioner can prove to the contrary by a preponderance of the evidence. Section 537 defines the term "reasonable needs of the business" to include the "reasonably anticipated" needs of such business. *178 Section 534 provides for circumstances in which the burden of proof regarding the reasonable needs of the business is placed on respondent. In this case, respondent has complied with the notification requirement of section 534(b), but petitioner did not submit the statement described in section 534(c) setting forth the grounds on which it relies in support of its position that accumulations were for the reasonable needs of the business. Therefore, petitioner in this case has the burden of proof with respect to the reasonable needs of its business. 381 Whether there has been an unreasonable accumulation of earnings is a question which must be determined by the conditions existing in the year of the accumulation. Events transpiring in subsequent years are not determinative of the issue except to the extent that such events may shed light upon the facts as they may have existed in the year in issue. Dixie, Inc., 31 T.C. 415, 426, 430 (1958), aff'd 277 F. 2d 526 (C. A. 2, 1960), certiorari denied 364 U.S. 827 (1960). *179 Sterling Distributors, Inc. v. United States, 313 F. 2d 803, 807 (C.A. 5, 1963). The question of whether accumulations are beyond the reasonable needs of a taxpayer's business is essentially one of fact. American Metal Products Corporation v. Commissioner, 287 F. 2d 860, 864 (C.A. 8, 1961), affirming 34 T.C. 89 (1960). Since in the first instance it is for the corporate officers and directors to determine the reasonable needs of the business, Faber Cement Block Co., 50 T.C. 317, 329 (1968), their judgment is not to be ignored in determining whether the facts and circumstances show the accumulation of earnings and profits to be beyond the reasonable needs of the business. Sterling Distributors, Inc., supra, at 807. Petitioner contends that the accumulations in the years in issue were (1) to meet working capital needs, and (2) to finance the resumption of petitioner's operations. Respondent takes the position that by the end of 1966 petitioner had abandoned its active asphalt paving operations, that it had no specific, definite, and feasible plans to resume its operations, and, therefore, the accumulations of earnings *180 in the years in issue were beyond the reasonable needs of the business. Respondent contends that since petitioner at the close of the taxable year 1966 was engaged in efforts to sell its operating assets, and discontinue its active business, it did not need to retain additional earnings at the close of that year. The record shows that as of the end of 1966 petitioner could not be assured that it would successfully negotiate the sale of its operating assets even though it was attempting to do so and in fact did in April 1967. However, it was not unreasonable for petitioner to plan for its future working capital needs as of the end of 1966 since it had not completed the sale of its assets at that time. We must therefore determine whether petitioner's accumulations of earnings in 1966 were in excess of its realistic working capital needs. Respondent's regulations provide that earnings and profits may be retained to provide for the working requirements of the business. Section 1.537-2(b)(4), Income Tax Regs. In the past we have used certain general "rules of thumb" as an aid in determining whether a corporation had sufficient working capital to meet its needs. However, the working *181 capital requirements of various businesses differ because of dissimilar economic environments and conditions, and, therefore, any rule of thumb is no more than a rule of administrative convenience. Dixie, Inc. v. Commissioner, 277 F. 2d 526, 528 (C.A. 2, 1960), affirming 31 T.C. 415 (1958), certiorari denied 364 U.S. 827 (1960), and Barrow Manufacturing Company v. Commissioner, 294 F. 2d 79, 81 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court, certiorari denied 369 U.S. 817 (1962). In view of the nature of petitioner's business and other relevant factors, shown by the record, such as its job turnover rate and its receivables turnover rate, we conclude that petitioner would be justified in retaining at the end of 1966 a cash reserve sufficient to cover one operating cycle. In some situations we have applied the socalled Bardahl [5] formula which allows as reasonable an accumulation of earnings equal to the expected costs for a single "operating cycle." *182 Faber Cement Block Co., supra, at 331, and Magic Mart, Inc., 51 T.C. 775, 792 (1969). Our calculation of petitioner's average expected costs for a single operating cycle of 60 days under the Bardahl formula is $53,940.46. [6] However, even if we were to accept petitioner's calculations (which we do not) of its total working capital needs in 1966 of $87,000, [7] that amount is less than 382 the amount of the actual accumulated earnings of $112,532.95 at the end of the taxable year 1966. Therefore, accumulations in excess of the minimum credit allowable in 1966 under section 535(c), unless shown to be otherwise required for the reasonable needs of the business, are subject to the accumulated earnings tax. There has been no such showing in this case. *183 Petitioner argues that in addition to an accumulation equal to the working capital needs of a single operating cycle it should be permitted an accumulation of not less than $30,000 for the submission of certified checks for bidding on government jobs. During the taxable year 1966 petitioner's requirements for certified checks totaled $30,800. The average time lag between issuance and return of certified checks was 38 days. The average requirements for funds for certified checks would be approximately $3,300 per cycle of 38 days. The maximum amount of funds encumbered by certified checks during the "peak" 38-day period in 1966 was $12,000. [8] When this amount is added to the amount computed to be petitioner's working capital requirements for a single operating cycle, it would in no event exceed the minimum allowable credit of $100,000. We note that in the taxable year 1965, petitioner was required to submit a certified check in the approximate amount of $30,000 to accompany its bid on *184 work on the Garden State Parkway. However, the record reflects that the Garden State Parkway job was significantly larger than the jobs customarily bid on by petitioner and that petitioner did borrow funds required to submit the certified check in this extraordinary and isolated instance. We, therefore, conclude that petitioner has not supported its contention of a need of additional accumulations of $30,000 for certified checks required to be submitted with certain bids for government work. Petitioner had no active business operation during the taxable year 1967, and it sold all of its operating assets in April 1967. Petitioner argues that it planned to resume its active business operations following McCarthy's recovery from eye surgery. Petitioner asserts that a resumption of its active business operations would require $95,500 for equipment, $40,000 for cash expenditures to resume operations, $80,000 for working capital, and not less than $30,000 for the submission of certified checks for bidding on government jobs. The above amounts would provide a total working capital of $150,000 which petitioner contends was necessary for the corporation to present a strong financial position *185 and provide a cushion in the event of a significant downturn in business. Section 1.537-1(b)(1), Income Tax Regs., provides in pertinent part: (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. * * * The regulations further provide that the requirement of a specific, definite, and feasible plan does not necessitate the expenditure of accumulated earnings immediately, "nor must plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business." Section 1.537-1(b)(1), Income Tax Regs.
While McCarthy may well have had some thought of resuming petitioner's asphalt paving operations when he was physically able to supervise petitioner's business activities, we find from the evidence as a whole that any such plans were vague and uncertain. *186 McCarthy's desire to resume business operations was contingent on his uncertain recovery from eye surgery and did not constitute a plan which was specific, definite, and feasible within the meaning of the regulations and the standards established in decided cases. Henry Van Hummell, Inc. v. Commissioner, 364 F. 2d 746 (C.A. 10, 1966), affirming a Memorandum Opinion of this Court, certiorari denied 386 U.S. 956 (1967), and Barrow Manufacturing Company v. Commissioner, supra. Respondent's position that petitioner's accumulations of earnings and profits in the years in issue were beyond the reasonable needs of the business gains additional 383 support from the facts (1) that petitioner was a closely held corporation which had a history of no dividend payments, (2) that petitioner maintained substantial amounts of cash and liquid investments unrelated to petitioner's paving business activities; and (3) that the retention of earnings and profits in the years in issue resulted in substantial tax savings to petitioner's shareholders. *187 Helvering v. National Grocery Co., 304 U.S. 282 (1938). We hold upon consideration of all of the evidence that petitioner allowed its earnings and profits to accumulate beyond the reasonable needs of the business in the years here in issue. The fact that petitioner's earnings and profits were allowed to accumulate beyond the reasonable needs of the business becomes determinative of its purpose to avoid the income tax with respect to its shareholders in the absence of proof by a preponderance of the evidence that avoidance of tax with respect to its shareholders was not one of the purposes of the accumulation. United States v. Donruss Company, 393 U.S. 297 (1969). There is no such proof in this case and we therefore hold that petitioner is subject to the accumulated earnings tax under section 531. Because of other issues raised in the pleadings which were disposed of by agreement or concession of the parties, Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. In 1965 F. D. McCarthy, Inc., bid on and was awarded a contract originally in the amount of $287,000 in connection with paving of the Garden State Parkway. It was contemplated that F. D. McCarthy, Inc., would do a portion of the work but subcontract most of the work to Shore River Construction Company. As a result of a change order the total contract price was $347,114.01. On December 27, 1965, the first estimate was made of progress on the contract in the amount of $53,111.65 and the amount of $47,800.49 ($53,111.65 less retainage of $5,311.16) was paid to F. D. McCarthy in January 1966. F. D. McCarthy, Inc., paid to Shore River Construction Company $42,800.49 in January 1966. These amounts were reflected in accounts receivable and accounts payable, respectively, of F. D. McCarthy, Inc., as of December 31, 1965. During 1966, Shore River Construction Company and F. D. McCarthy, Inc., had certain disagreements regarding the Garden State Parkway job. Subsequent thereto F. D. McCarthy, Inc., performed no further work on that job. After April 1966, receipts from the Garden State Parkway were credited to an exchange account as were disbursements to Shore River Construction Company after April 1966. These gross receipts and gross disbursements after April 1966 were not reflected on the Federal income tax return of F. D. McCarthy, Inc., for 1966. However, petitioner remained primarily liable for the performance of the contract until the work was completed and accepted by the State.↩
1. Includes $164,541.91 in stock and bonds of nationally known companies.↩
3. See footnote 2 on page 377 for explanation of source of part of receipts and disbursements in the first 3 months of 1966.↩
1. Lowest bank balance in first half of the year was on May 14. It was $29,987.89 on that date. ↩
2. Lowest bank balance in second half of the year was on November 2. It was $26,787.09 on that date.↩
4. Secs. 531 through 535 and sec. 537, I.R.C. 1954, provide insofar as here pertinent: SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000 plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. * * * SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. * * * Sec. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in sub-section (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a) the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * * (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. * * * SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition. - For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus * * * the accumulated earnings credit (as defined in subsection (c)). (b) Adjustments to Taxable Income. - For purposes of subsection (a), taxable income shall be adjusted as follows: (1) Taxes. - There shall be allowed as a deduction Federal income and excess profits taxes * * * accrued during the taxable year. * * * (c) Accumulated Earnings Credit. - (1) General rule. - For purposes of subsection (a), in the case of a corporation * * * the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, * * * (2) Minimum credit. - The credit allowable under paragraph (1) shall in no case be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year. * * * SEC. 537. REASONABLE NEEDS OF THE BUSINESS. For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.↩
5. Bardahl Manufacturing Corp., T.C. Memo. 1965-200↩.
6. Petitioner had no inventory. Therefore, our determination of petitioner's operating cycle is based upon the average term of jobs plus the average receivables turnover time, which, based upon the information before us, we calculate to be 60 days. Petitioner's cash disbursements for operating expenses for the taxable year 1966 were $323,642.75. Applying the formula: 60/360 X 323,642.75 = 53,940.46 ↩
7. Petitioner argues on brief that its minimum working capital needs were for one and onehalf operating cycles and apparently computes that to be $87,000. There is nothing in the record to demonstrate that an accumulation for more than a single operating cycle is reasonable. United States v. McNally Pittsburgh Manufacturing Corp., 342 F. 2d 198↩ (C.A. 10, 1965).
8. Between October 5, 1966, and November 2, 1966, petitioner issued certified checks in the amount of $12,000. There were no other certified checks still outstanding during this period of time.↩