**MOTOR FUEL CARRIERS, INC., Plaintiff-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Defendant-Appellee.**

**No. 76-1038.**

United States Court of Appeals, Fifth Circuit.

Sept. 30, 1977.

---

William R. Frazier, Jacksonville, Fla., for plaintiff-appellant.

Gilbert E. Andrews, Acting Chief, Appellate Section, Tax Div., Elmer J. Kelsey, John G. Manning, Attys., Meade Whitaker, Chief Counsel, U. S. Dept. of Justice, I. R. S., Washington, D. C., for defendant-appellee.

Before THORNBERRY, GODBOLD and FAY, Circuit Judges.

GODBOLD, Circuit Judge:

This is an accumulated earnings tax case. 26 U.S.C. §§ 531 *et seq.* The government determined deficiencies in taxpayer's income tax for years 1968, 1969 and 1970 of roughly $59,000, $63,000 and $51,000, respectively. The Tax Court upheld these determinations. We reverse.

Most of the facts have been stipulated. Taxpayer Motor Fuel Carriers, Inc. (MFC) is a Florida close corporation whose business is highway transportation of petroleum products. John S. Espy bought MFC in 1946, shortly after its being chartered. Together with members of his family, Espy owns almost all the MFC stock. In the ensuing years he has turned MFC from a losing proposition into a flourishing enterprise with an earned surplus of roughly $1.5 million[1] prior to the years in question. Further success during the taxable years brought this figure to roughly $2 million. Despite this record, MFC has made only one distribution to its shareholders, a $20,000 cash dividend in 1956. MFC's resulting accumulations have attracted the interest of the Internal Revenue Service for some time. *See Motor Fuel Carriers, Inc. v. U. S.,* 202 F.Supp. 497 (N.D.Fla.,1962), *vacated and remanded on other grounds,* 322 F.2d 576 (CA5, 1963), *on remand,* 244 F.Supp. 380 (N.D.Fla.,1965). The litigation represented by these cases sustained an assessment of accumulated earnings tax for years 1956–1957. Years 1958–1967 were resolved by settlement.

---

1. This figure includes $600,000 of earned surplus that was capitalized in 1962. App. 295–96.

During the taxable years now in question, MFC had only three points of authorized intrastate operation: Pensacola, Panama City, and Jacksonville. It seeks to justify its accumulations during these years as necessary to finance an expansion of its service to include shipments originating from the Tampa area.

■■■ The accumulated earnings tax applies to a corporation "availed of for the purpose of avoiding the income tax with respect to its shareholders . . . by permitting earnings and profits to accumulate instead of being divided or distributed." 26 U.S.C. § 532(a). The Code supplies an objective test for assessing the existence of this forbidden purpose, and it is upon this test that most cases focus:

> [T]he fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

*Id.* § 533(a). Section 537(a)(1) allows inclusion of "reasonably anticipated needs" as part of "reasonable needs of the business." Whether and when the Tampa expansion can be considered a reasonably anticipated need depends upon the existence of a plan for spending accumulations on this project that is "specific, definite, and feasible":

> (b) *Reasonably anticipated needs.* (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have *specific, definite, and feasible* plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used with-

in a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

Treas.Reg. § 1.537–1(b)(1) (emphasis supplied).[2]

## I. *Burden of proof*

■■■ Although not necessary to our resolution of the "specific, definite, and feasible" question, we resolve at the outset a procedural dispute between MFC and the government. Ordinarily, the burden in a Tax Court proceeding lies with the taxpayer to prove that he accumulated his earnings for the reasonable or reasonably anticipated needs of his business. Section 534, however, transfers the burden of proof to the government on this reasonable needs question where the taxpayer furnishes a timely

> statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

26 U.S.C. § 534(c). MFC submitted a timely statement here. The Tax Court held that MFC's statement failed to satisfy the conditions of § 534 for the same reasons that it held the Tampa plan indefinite: presumably (though we cannot tell for sure) because the corporate minutes and financial statements contained in the document constituted an inadequate showing of accumulation for reasonable needs.

■■■ The Tax Court, we think, failed to distinguish between the substantive § 533(a) inquiry as to whether the taxpay-

2. The word "definite" comes from the legislative history. *See Motor Fuel Carriers, Inc. v. U. S.,* 322 F.2d 576, 578 (CA5, 1963).

er's plan is definite and the procedural § 534 inquiry as to whether his statement suffices "to show the basis" of his claim of a need for earnings to finance expansion. We think § 534's language indicates that the statement simply serves a notice function. Whether the "grounds" divulged in the statement subsequently prove convincing is irrelevant to this function. We have examined MFC's statement and conclude that it gave the government a sufficiently specific idea of how MFC planned to proceed at trial. All the arguments made by MFC in support of definiteness here (and considered in part II) were divulged in this lengthy statement, including the accuracy of the cost projections for the Tampa expansion, the intent manifested in the corporate minutes, and the continuing interest of MFC over many years in obtaining a Tampa certificate. It is true, as the government observes, that the statement failed to break down the 1968–1970 cost projections into "component costs." But just as the statement is not supposed to be legally sufficient on the question of definiteness, neither is it supposed to be a substitute for testimony at trial. *Rhombar Co. v. Commissioner of Internal Revenue*, 386 F.2d 510, 515 (CA2, 1967). Here, MFC sufficiently "showed its hand." *R. Gsell & Co. v. Commissioner of Internal Revenue*, 294 F.2d 321, 325 (CA2, 1961). We hold that this is all that § 534 requires.

## II. *Specific, definite, and feasible plans*

■ Independently of our assessment concerning the burden of proof, we hold that the Tax Court's finding that the Tampa plan was indefinite as of 1968 and 1969 is clearly erroneous.[3]

Whether or not the plan was definite during these years depends upon whether MFC's intent was manifested by some "sub-stantial active move toward implementation." *Barrow Manufacturing Co. v. Commissioner of Internal Revenue*, 294 F.2d 79, 81 (CA5, 1961), *cert. denied*, 369 U.S. 817, 82 S.Ct. 827, 7 L.Ed.2d 783 (1962). *See also Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue*, 241 F.2d 197, 202 (CA4), *cert. denied*, 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957) ("some contemporaneous course of conduct directed toward the claimed purpose"); *Henry Van Hummell, Inc. v. Commissioner of Internal Revenue*, 364 F.2d 746, 750 (CA10, 1966), *cert. denied*, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102 (1967) ("some clear action . . . [to] include the adoption of specific plans or programs"). Accordingly, we must look at the nature of the steps taken by MFC toward realization of the Tampa expansion during these years.

The board minutes reveal an intent on December 19, 1968, to apply to the state public utilities commission for a certificate "sometime in 1969." The minutes estimated that the expansion would cost approximately $1 million and the board resolved that it would be wise to declare no dividends. On December 3, 1969, MFC made its formal application for a certificate. Next, at a board meeting on December 12, 1969, minutes similar to those of the 1968 meeting reveal that Espy informed those present that he expected the project to cost $1 million for purchase of real estate, construction of terminal facilities, and purchase of operating equipment. The Board again resolved to retain its earnings for the year just completed. On December 3, 1970, the state approved the MFC application.[4] A December 31, 1970, meeting of the board resulted in a cost projection of $950,000 or more and a third resolution to declare no dividends. In addition, 1970 saw the beginning of actual expenditure at Tampa. MFC spent some $416,000 (or, by the govern-

---

3. This is the appropriate scope of review on the question of reasonable anticipation. *Myron's Enterprises v. United States*, 548 F.2d 331, 334 (CA9, 1977); *Motor Fuel Carriers, Inc. v. United States*, 322 F.2d 576, 579 (CA5, 1963).

4. MFC had previously withdrawn its December 3, 1969, application, but only to obtain greater shipper support in a refiling made on March 12, 1970.

ment's calculations, $440,000) on the terminal that year—roughly 40% of the total costs of the entire project. The project as completed in 1972 cost roughly $1,029,000, only some $29,000 more than the original 1968 estimate of $1 million.

These events form a pattern dissimilar from that in most accumulated earnings tax cases. Here, MFC actually completed the bona fide[5] project that it argues had been planned. The question is therefore one of timing: how early did MFC demonstrate a specific intent to expand its operations to Tampa? Subsequent events "may throw light upon the facts as existing" during 1968 and 1969. *Sterling Distributors, Inc. v. U. S.*, 313 F.2d 803, 807 (CA5, 1963). Here, such events are not "merely the products of afterthought," *Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue*, 241 F.2d 197, 202 (CA4), cert. denied, 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957); they are facts in the real world. Knowing what we know now about the completed expansion gives us a better insight into the events of these earlier years.

We agree with the Tax Court's finding that by 1970 the plan had become definite. The government insists that even in 1970 accumulations were justified only up to the amount spent that year on the Tampa expansion, without any allowance for amounts to be spent in the following years. This rather unyielding approach is difficult to square with the idea of "anticipated" needs. As we noted at oral argument, the bottom line of the government's position is that one like MFC, with a consistent history of financing only through retained earnings, can only plan on saving during the tax year the amounts it plans to spend during that year.

The assumption here is that the taxpayer can do well enough in each succeeding year to finance the completion of the project in those years. Such business judgments are simply not the province of the government. *Sterling Distributors*, 313 F.2d at 807; *cf. Henry Van Hummell, Inc. v. Commissioner of Internal Revenue*, 364 F.2d 746, 749 (CA10, 1966), cert. denied, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102 (1967) (reasonableness is initially "for determination by those concerned with the management of the particular enterprise"). So long as definite plans exist, MFC "need not necessarily consummate these plans in a relatively short period after the close of the taxable year." H.R.Rep.No.1337, 83d Cong., 2d Sess. (1954), reprinted in [1954] U.S.Code Cong. & Admin.News, p. 4312; accord, Treas.Reg. § 1.537–1(b)(1). Certainly by 1970 the large expenditures made by MFC and the legal action taken in obtaining a certificate that year made its plan a sufficiently definite one of a rather specific nature.

Obviously, by 1968 or 1969 the plan had yet to manifest itself in land, buildings, or equipment. But we cannot ignore the fact that by December 1968 MFC had articulated in its corporate minutes an intent to apply for a certificate during the following year and forecast almost exactly the cost of the proposed expansion.[6] To have made such a precise prediction in a project as expensive as this one indicates that MFC had a clear idea of what it needed to do to establish a new terminal at Tampa. In such a situation, we agree with the reasoning of *Faber Cement Block Co. v. Commissioner*, 50 T.C. 317, 332–33 (1968),[7] that the objective manifestations of intent need not be "formal blueprints for action":

As a result, Tampa was where the money was, as far as MFC was concerned.

5. There is no question that the Tampa terminal idea was a "feasible" one and not just a product of tax planning. The evidence shows that more petroleum products are shipped from Tampa than from all of the other ports in Florida combined. Because Tampa is closer to the Louisiana and Texas refineries, the "laid down" costs there are less to shippers. In addition, two of MFC's three points of origin could not receive deep water tanker shipments.

6. During a colloquy with government's counsel at trial, the Tax Court also emphasized this fact.

7. In *Faber Cement*, corporate minutes reflected only a need for "investigation" and "further study." Cf. *Cheyenne Newspapers, Inc. v. Commissioner of Internal Revenue*, 494 F.2d

We also recognize that petitioner's plans for expansion were not set forth in the minutes or other documentary material with precision or in detail. But the requirement of "specific, definite, and feasible" plans does not demand that the taxpayer produce meticulously drawn, formal blueprints for action [citing *Sterling Distributors*, 313 F.2d at 807]. . . The test is a practical one, namely, that the contemplated expansion appears to have been "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations." *See Smoot Sand & Gravel Corporation v. Commissioner*, [274 F.2d 495] at 499 [CA4, 1960]. The decided cases, which admittedly cover a variety of factual situations, indicate that in applying this test the courts primarily take into account evidence of actual implementation in evaluating the specificity of plans as they existed during the critical period, provided that some evidence of plans is adduced. . . .

. . . . .

Finally, we cannot and will not ignore the ultimate fruition of petitioner's expansion plans—accomplished within a reasonable time after the years in question at a cost closely in line with the amount originally estimated. While not controlling, evidence of what petitioner in fact did in subsequent years certainly affects the weight to be given its declared intention during the years in issue.

The evidence, we think, realistically points only in one direction. MFC, which had formally applied for a Tampa route as early as 1960, finally succeeded in obtaining the route in the period 1968–1972. Of course, its plant was not actually built by 1968. But completion was more than a vague idea

429 (CA10, 1974) (plan for establishing a Sunday edition held indefinite, even where edition later materialized, since only evidence of plan was a meeting urging greater in-depth study).

in the mind of Espy. MFC had made accurate estimates of cost. *See Cheyenne Newspapers, supra* (plan to purchase offset press would have been definite had cost estimate been made during taxable years and not preparatory to trial). It had announced plans to apply for a certificate. It later followed through on these steps in its "regular course of business," *Sterling Distributors*, 313 F.2d at 807. To borrow the Tax Court's own characterization at trial, Espy "put his money where his mouth is," and he did so "within the reasonably calculable future," *Barrow Manufacturing Co. v. Commissioner of Internal Revenue*, 294 F.2d 79, 81 (CA5, 1961), *cert. denied*, 369 U.S. 817, 82 S.Ct. 827, 7 L.Ed.2d 783 (1962). To ask for more concrete evidence of this subsequently manifested and feasible plan would, we think, impose planning procedures on the managers of a business that were never intended by the drafters of this taxation scheme.

The Tax Court relied heavily upon the fact that MFC had already been assessed accumulated earnings taxes once before and that its use of the corporate minutes to bolster its plan's specificity and definiteness was patterned after its earlier strategy. "Mr. Espy," the court observed, "seems to have gained little by [his prior] experience." In view of the accurate cost projections made in these minutes, this was an insufficient basis for finding the subsequently implemented Tampa plan to be indefinite. The use of corporate minutes is not necessarily inadequate. *Cf., e. g., Henry Van Hummell, Inc., supra*, 364 F.2d at 750 (". . . the record fails to show any clear testimony or evidence by way of minutes or financial statements that the ideas for diversification or expansion 'were in such stages of planning as would justify accumulation of earnings' "). We do not

Thus, the plans were more embryonic than those here. The Tax Court nevertheless found them adequate.

fault a taxpayer for engaging in tax planning where the evidence shows that it has indeed formulated a project for corporate action. As the Tax Court noted in *Faber Cement*, "the aura of tax consciousness does not destroy the fact that the minutes contain evidence of plans to expand." 50 T.C. at 332.

### III. *Need for accumulation*

 Having found the $1 million Tampa plan definite, and therefore a reasonably anticipated business need, we must ask whether the assets available to MFC were nevertheless adequate in 1968, 1969, or 1970 to finance this plan without requiring MFC to retain the additional earnings of these years. *Smoot Sand & Gravel Corp. v. Commissioner*, 274 F.2d 495, 501 (CA4), *cert. denied*, 362 U.S. 976, 80 S.Ct. 1061, 4 L.Ed.2d 1011 (1960). For this purpose, we look to net liquid assets (current assets less current liabilities) at the end of each taxable year. *Ivan Allen Co. v. U. S.*, 422 U.S. 617, 621, 95 S.Ct. 2501, 2503, 45 L.Ed.2d 435, 440–41 (1975). MFC asks us instead simply to compare its earnings for a given year with the amount of its capital investments made in that year. This theory ignores the "economic reality" at which the statute is directed, *id.* at 627, 95 S.Ct. at 2506, 45 L.Ed.2d at 443. If one already has accumulated enough to meet his needs, he cannot accumulate any more without being taxed on the addition. As the Court explained in *Ivan Allen,*

> What is required, then, is a comparison of accumulated earnings and profits with "the reasonable needs of the business." Business *needs* are critical. And need, plainly, to use mathematical terminology, is a function of a corporation's liquidity, that is, the amount of idle current assets at its disposal.

*Id.* at 628, 95 S.Ct. at 2507, 45 L.Ed.2d at 444 (emphasis in original).[8]

The balance sheets of MFC for the three years in question have been stipulated:

| | 1968 | 1969 | 1970 |
|---|---|---|---|
| Current Assets: | | | |
| Cash on Hand and in Bank | $ 172,407.48 | $ 187,337.46 | $ 333,549.54 |
| Accounts Receivable | 86,452.61 | 82,825.44 | 141,385.14 |
| Misc. Special Deposits | 14,178.50 | 10,169.50 | 10,224.50 |
| Temp. Cash Investments | 300,000.00 | 501,216.50 | 0 |
| Prepayments | 19,557.88 | 25,861.24 | 29,002.04 |
| Carrier Operating Property: | | | |
| Property Costs | 1,894,952.78 | 1,964,822.69 | 2,415,139.65 |
| Less: Accrued Depreciation | 994,363.71 | 1,120,436.12 | 1,077,977.64 |
| Carrier Non-Operating Property: | | | |
| Property Costs | 427,194.95 | 429,643.55 | 460,777.26 |
| Less: Accrued Depreciation | 218,169.63 | 236,546.76 | 253,153.85 |

---

**8.** Assume, for example, that prior to the taxable year a taxpayer has $1 million in cash over and above any liabilities. Assume further that during the taxable year he makes additional net earnings of $1,000 and also buys equipment for his business that costs him $1,000. Despite the fact that in a narrow sense he has spent what he has made during the year, he has accumulated the $1,000 unreasonably because he already had enough cash available to buy the equipment. He really did not need the $1,000 to buy the equipment, and he must therefore distribute it to shareholders or pay the § 531 surtax on it, unless his need for working capital or reasonably anticipated projects exceeds $1 million.

| | 1968 | 1969 | 1970 |
|---|---|---|---|
| Other Assets: | | | |
| Operating Rights—Net | 1,589.13 | 1,589.13 | 12,958.92 |
| Cash Surrender Value of Life Insurance | 177,999.37 | 194,894.58 | 209,974.53 |
| Misc. Investments | 100.00 | 0 | 0 |
| Other Deferred Debits | 40.00 | 1,000.00 | 230,559.12 |
| TOTAL ASSETS: | $1,881,939.36 | $2,042,377.21 | $2,512,439.21 |
| Current Liabilities: | | | |
| Accounts Payable | $ 34,798.84 | $ 49,211.48 | $ 335,191.00 |
| Wages Payable | 4,462.43 | 7,441.73 | 11,790.53 |
| Taxes Payable | 21,302.78 | 16,147.12 | 21,224.79 |
| Safety Bonus Payable | 4,284.64 | 4,802.32 | 5,042.51 |
| TOTAL LIABILITIES: | $ 64,848.69 | $ 77,602.65 | $ 373,248.83 |

In comparing MFC's needs and available funds, we use the government's itemizations, with two modifications noted below.

▇ With respect to 1968, MFC held $172,000 (round numbers) in cash and $300,000 in government securities available to meet its business needs. To these sums we add $86,000 in accounts receivable. The Court in *Ivan Allen* expressly reserved its view on the inclusion of receivables. 422 U.S. at 629 n.9, 95 S.Ct. at 2507 n.9, 45 L.Ed.2d at 445 n.9. In the circumstances of MFC's business, however, we cannot fault the Tax Court for concluding that the company could have counted on these intangibles to meet its upcoming business needs. The dependability of its customers [9] and the relatively short billing cycle were insurance enough to MFC itself that it apparently never resorted to a bad debt reserve. However, we cannot accept the Tax Court's conclusory [10] inclusion of the cash surrender value of life insurance on the lives of Espy and his wife and the cost of a leased tank terminal ("carrier non-operating property," *supra*). As to the first, "What corporate purpose could be considered more essential than key man insurance?" *Cf. Emeloid Co. v. Commissioner of Internal Revenue*, 189 F.2d 230, 233 (CA3, 1951) (dictum). *See also B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders*, ¶ 8.07, at 8–26 & n.51 (1971). As to the second, the record reveals that MFC tried to sell the terminal to its lessee, La Gloria Oil and Gas Co., in 1969 for $400,000, some $15,000 less than MFC had paid for it. La Gloria refused to buy. This proven nonliquidity strikes us as radically different from the "quick assets" involved in *Ivan Allen* (e. g., Xerox Corp. common stock) or *Battelstein Investment Co. v. United States*, 442 F.2d 87, 89 (CA5, 1971) ("blue-chip" note secured by "gilt-edged" land).[11]

In sum, we think only the cash, securities, and receivables should be characterized as readily available assets. The government concedes that we must subtract from this total the current liabilities ($65,000), net operating expense needs ($64,000 less prepayments, *supra*, of $20,000 = $44,000), and potential tax liability for earlier years ($87,000). The difference comes to $362,000,

9. The United States government and Standard Oil together provided some 62% of MFC's annual freight revenues during the years in question.

10. The court's unexplained inclusion of these items in the category of liquid assets is all the more perplexing in view of its contrary position taken at trial. App. 160–62.

11. While by 1974 the economics of the business had changed so much as to enable MFC to sell the terminal to La Gloria for $600,000, we cannot judge liquidity in earlier years from circumstances four to six years later.

Like MFC, we note with some irony the government's emphasis upon subsequent events here in spite of its more short-term view of the Tampa expansion plan.

which of course is far less than the $1 million required for the Tampa project.[12]

Similarly, at the end of 1969, the balance sheets show $187,000 in cash, $83,000 in receivables, and $501,000 in investments; on the other side, $78,000 in current liabilities, $38,000 in net operating expenses ($64,000 less prepayments of $26,000), and $87,000 in potential tax liability. The difference here is $568,000, again, less than the reasonably anticipated expenses of building the Tampa terminal.

Finally, at the end of 1970, MFC shows $334,000 in cash and $141,000 in receivables; on the other side, $373,000 in current liabilities and $82,000 in net operating expenses ($111,000 less prepayments of $29,000). The difference is only $20,000. (By the end of 1970, we note again, MFC had incurred some 40% of its Tampa needs).

Regardless of whether MFC has the burden of proof, because the Tampa expansion was a reasonably anticipated business need in 1968–1970 for which MFC's prior accumulations were not sufficient, the Tax Court's sustaining of determinations of deficiency for these years is reversed.

REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

---

12. Hence, even including the value of the life insurance policies ($178,000), MFC would have been justified in accumulating its earnings.

Of course, MFC spent no money at Tampa in 1968. But we have already rejected the government's use of actual expenditures as a measure of reasonably anticipated needs.