MARIE'S SHOPPE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marie's Shoppe, Inc. v. Commissioner
Docket Nos. 6901-74 5023-76
United States Tax Court
T.C. Memo 1977-381; 1977 Tax Ct. Memo LEXIS 67; 36 T.C.M. (CCH) 1548; T.C.M. (RIA) 770381; October 31, 1977, Filed *67 Petitioner had accumulated earnings and profits for the years 1971, 1972 and 1973 of $161,535.78, $178,368.06 and $192,785.49, respectively. Held, petitioner had accumulated these earnings and profits to capitalize moving, expanding or remodeling the business premises; to meet contingent liabilities; and to cover working capital needs. Held further, avoidance of income tax with respect to its shareholders was not the purpose of such accumulations. C. M. Meadows, Jr., for the petitioner. John D. Copeland, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent, on May 31, 1974, mailed to petitioner a statutory notice of deficiency asserting a deficiency in accumulated earnings tax under section 531, I.R.C. 1954 for the taxable year 1971 in the amount of $6,879.16. On March 8, 1976 respondent mailed a statutory notice of deficiency to petitioner assering deficiencies in accumulated earnings tax under section 531 in the amounts of $5,136.73 and $4,433.66 for the taxable years 1972 and 1973, respectively. Whether petitioner has accumulated earnings and profits beyond the reasonable needs of the business and is, therefore, a corporation "formed *68 or availed of for the purpose of avoiding the income tax with respect to its shareholders" [1] in the taxable years 1971, 1972 and 1973 is the sole issue before us. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Marie's Shoppe, Inc., was incorporated in Texas in 1962. Its principal place of business is located at 107 W. Main Street, Grand Prairie, Texas. For the taxable years in issue petitioner timely filed corporate Federal income tax returns with the internal revenue service center in Austin, Texas. Petitioner's returns were calculated on a calendar year basis, using the accrual method of accounting. Petitioner's business is principally a retail ladies' dress and children's clothing shop. The business was operated as a proprietorship by Marie Baker and her brother, Johnnie R. Crouch, prior to its incorporation. Since its incorporation petitioner's stock has been owned 98 percent by Marie Baker, 1 percent by her husband, Bill Baker, and 1 percent by Johnnie R. Crouch. The above shareholders are president, *69 vice president and secretary-treasurer of the corporation, respectively. Petitioner has never paid a dividend for any taxable year ending before December 31, 1973. Petitioner is not a mere holding or investment company. Petitioner's earnings and profits and the increase in earnings and profits over prior years during the years here in issue were as follows: Accumulated earnings
Increase over
Date
and profits [2]
prior years
January 1, 1971
$136,520.65
$
December 31, 1971
161,535.78 [3]
25,015.13
December 31, 1972
178,368.06
16,832.28
December 31, 1973
192,785.49
14,417.43
Petitioner's annual operating costs, including its cost of goods sold (excluding depreciation and Federal income taxes), for the years here involved were as follows: Operating costs (ex-
cluding depreciation
and Federal income
Cost of
Year ended December 31--
taxes)
good sold
Total
1971
$ 89,645.35
$157,096.18
$ 246,741.53
1972
79,824.83
165,259.32
245,084.14
1973
103,588.04
181,623.86
285,211.90
Petitioner's *70 working capital as of the end of the years in issue was as follows: Current Assets
1971
1972
1973
Cash
$166,764.18
$174,499.57
$188,454.75
Accounts and notes receivable
19,434.95
20,300.28
20,562.65
Inventory
46,662.48
44,633.02
47,584.09
Investments
1,176.00
1,176.00
1,176.00
Prepaid rent
450.00
450.00
450.00
Total current assets
$234,487.61 [4]
$241,058.87
$258,227.49
Current Liabilities
Accounts payable
$ 10,259.21
$ 9,720.72
$ 10,245.08
Accrued taxes [5] *71 11,697.10
6,603.16
7,481.17
Total current liabilities
$ 21,956.31
$ 16,323.88
$ 17,726.25
Working capital
$212,531.30
$224,734.99
$240,501.24 Petitioner's ratio of current assets to current liabilities during the years in issue was as follows: Year
Current ratio
1971
10.7 to 1
1972
14.8 to 1
1973
14.6 to 1
Available working capital as reflected on petitioner's balance sheets for the years in question was as follows: 1971
1972
1973
Total current assets
$234,487.61
$241,058.87
$258,227.49
Total other assets [6]
1,417.42
7,893.07
6,544.25
Total assets
$235.905.03
$248,951.94
$264,771.74
Total current liabilities
$ 21,956.31
$ 16,323.88
$ 17,726.25
Total other liabilities
Total liabilities
$21,956.31
$ 16,323.88
$ 17,726.25
Capital stock
$ 54,260.00
$ 54,260.00
$ 54,260.00
Retained earnings
159,688.72
178,368.06
192,785.49
Total liabilities and
capital
$235,905.03
$248,951.94
$264,771.74
Total capital
$213,948.73
$232,628.06
$247,645.49
Less working capital
212,531.30
224,723.99
240,505.24
Total other assets
$ 1,417.42
$ 7,893.07
$ 6,544.25
A summary of salient facts is as follows: Summary Table
(1)
(2)
(3)
Increase in
accumulated
Available
Year ended
Accumulated
earnings
working
December 31 -
earnings and
and profits
capital
profits
Figures re peak
inventories
1971
$161,535.78
$25,015.13
$212,531.30
1972
178,368.06
16,832.28
224,734.99
1973
192,785.49
14,417.43
240,501.24
*72 (4)
(5)
(6)
Ordinary
Other
operating
anticipated
Year ended
expenses
reasonable
Excess of
needs
December 31 -
for 1 cycle *
of the
working
business
capital
Figures re peak
inventories
1971
$140,058.27
$100,000.00 [7]
0
1972
131,009.50
100,000.00
0
1973
138,124.45
110,000.00 [8]
0
*73 Expanding, remodeling, or moving the business
Initially, petitioner's business was located at 108 W. Main Street. To obtain more floor space the business was moved across the street to its present location about 1959. The premises at the present location are owned by Bill Baker and are rented to petitioner pursuant to an oral month-to-month lease. In 1967 petitioner contacted an abutting landowner concerning the acquisition of such property, but made no offer for the property. At a 1968 directors' meeting petitioner's president mentioned that plans for expansion were being made. Thereafter, moving the business to a corner lot on the same street was considered and the initial drawings were made for the future building. This plan was subsequently abandoned and the property, owned by petitioner's vice president, was sold in 1970. In 1972 petitioner entered into a sales contract to purchase property in Cedar Hill, a town within 10 miles of Grand Prairie with a population at that time of about 5,000. The property, 43.4 acres, was suitable for residential purposes and for future commercial purposes. The agreement provided for a sales price of $64,875 cash. The sale was never consummated *74 through no apparent fault of petitioner. In 1973 two verbal offers were made by petitioner for properties located in downtown Grand Prairie. When asked about anticipated costs for expanding or moving the business petitioner estimated the cost of acquiring a new site and building thereon to be in excess of $100,000, and estimated the cost of remodeling the present location to be $65,269.20. Contingent liabilities
Petitioner became aware, in 1973, that an accumulated earnings tax for the taxable year 1971 might be imposed by respondent. If imposed a liability would arise for additional taxes due. During 1971 and 1972 petitioner anticipated a per footage assessment by the City of Grand Prairie.Petitioner calculated that the assessment could be as high as $15,000. The actual cost, assessed in 1973, was $30 per foot. The economic condition of downtown Grand Prairie, Texas
Downtown Grand Prairie has undergone continuous planning and development, at least since 1966. Two governmental units undertook projects affecting petitioner which are relevant to the accumulations at issue. One of the agencies, the Grand Prairie Urban Renewal Agency, developed plans for future projects during *75 1969 and 1970. Actual work in the downtown area began in 1971 when a building about 125 feet from petitioner was demolished, causing sidewalk blockage for 30 days and raising dust. This agency, in 1972, completed plans and held public hearings for the projects scheduled for 1973. These projects, in part, consisted of storm sewer and drainage improvement. Work on this improvement commenced in June of 1973 and ended in January of 1974. This project disrupted traffic flow and parking on Main Street due to the installation of drainage pipe. In addition, the Urban Renewal Agency installed a new water line underneath the parking lot behind petitioner, blocking access to the lot from one street at a time which meant that only one-half of the lot was available for parking. This condition lasted for about 3 months in the latter part of 1973. The second governmental unit undertaking a project in the downtown sector, the City of Grand Prairie, initiated a "downtown improvement project". Planning for this project began in 1972; hearings were held in 1973. The construction contract, signed in 1973, provided for removal of the old sidewalk; construction of a new sidewalk, planters and loggia; *76 and the elimination of on-street parking. The actual work commenced January 28, 1973 and terminated January 10, 1975. This project caused considerable disruption of sidewalk traffic in front of petitioner's business. OPINION The only issue before us is whether, during the taxable years 1971 through 1973, petitioner was "availed of for the purpose of avoiding income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." Section 532, I.R.C. 1954. If so, petitioner is liable for the accumulated earnings tax imposed by section 531. See sections 531 through 537 of the 1954 Code, as amended, the material provisions of which are in the margin. [9] *77 *78 *79 Burden *80 of proof
Initially, we must consider who has the burden of proof for purposes of deciding whether or not all or a part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business. On December 2, 1973 respondent mailed to petitioner a statement pursuant to section 534(b) informing petitioner that issuance of a statutory notice of deficiency had been proposed for the taxable year 1971 which included an accumulated earnings tax as imposed by section 531. On December 28, 1973 petitioner mailed to respondent a statement of grounds pursuant to section 534(c) upon which it relied to establish that, for the taxable year ended December 31, 1971, no part of petitioner's earnings and profits had accumulated beyond the reasonable needs of the business. At trial petitioner moved that the burden of proof be shifted to respondent for this taxable year. After hearing both parties and due consideration we held that the statement submitted by petitioner contained insufficient details to permit a judgment to be made relative to whether or not the surplus was unreasonably accumulated. [10] *81 Because the statement failed to satisfy the provisions of section 534(a)(2) the burden of proof for the taxable year 1971 is on petitioner. For the taxable years 1972 and 1973 respondent did not notify petitioner pursuant to section 534(b). In the absence of such notification, section 534(a) provides that the burden of proof is on respondent. Thus, for the taxable years 1972 and 1973 the burden of proof is on respondent. Respondent has failed to carry this burden. Whether petitioner has allowed accumulations of its earnings and profits beyond its reasonable needs is a question of fact. Section 1.533-1, Income Tax Regs. To determine whether any part of the earnings and profits of the taxable year was retained for the reasonable needs of the business the amount, the reasonableness and the nature of prior years' accumulations *82 will be considered. Smoot Sand & Gravel Corp. v. Commissioner,274 F. 2d 495 (4th Cir. 1960), cert. den. 362 U.S. 976 (1960). Petitioner asserts that its accumulated earnings and profits were retained for the following anticipated needs of the business: (1) to protect the business from uncertainty due to the health of the major shareholder; (2) to provide a fund from which to pay contingent liabilities; (3) to provide a fund for expanding, moving or remodeling the business; and (4) to provide for the working capital needs of the business. Health of the major shareholder
Petitioner contends that retention of additional earnings and profits was necessary to protect the continuation of the business due to the poor health of the management. While there is evidence that the major shareholder was not in perfect health, she testified that a minor shareholder was daily involved in the business and was capable of managing a second store. This leads us to believe that the health of the major shareholder, while naturally of concern in a close corporation, did not impose a significant threat to the continuance of the business. Contingent liabilities
Two contingent liabilities were raised *83 by petitioner. The first of these is the special assessment the city levied in 1973 at the rate of $30 per front foot on the building housing petitioner's business.The assessment was levied to fund its downtown improvement project. When the assessment is computed, using 24 feet as the front footage of the building, the assessment works out to be $720. While this is not a liability that should be overlooked it is hardly of significant size to warrant the retention of the earnings and profits herein at issue. Belief that the assessment could be as high as $15,000 does not enhance petitioner's position because the building on which this anticipated liability was to be assessed was rented, not owned, by petitioner. Though petitioner pays for minor repairs, maintenance and upkeep, taxes are paid by the landlord.The special assessment tax is generally considered to be a landlord liability. J. W. Perry Co. v. City of Norfolk,220 U.S. 472 (1911). There is no evidence presented that petitioner's oral landlord-tenant agreement provided for liability contrary to the general rule. Therefore, the possibility of a special assessment is not a contingent liability of petitioner.
The second contingent *84 liability raised by petitioner is the possible imposition of an accumulated earnings tax for the taxable year 1971 and the resulting expense for legal and accounting advice. Petitioner became aware of this possibility in 1973 and could, therefore, reasonably anticipate this expense only from that time. Respondent's Revenue Ruling 70-301, 70-1 C.B. 139 (1970), provides that the amount of an accumulated earnings tax is a reasonable need of the business for taxable years in which it is a contingent liability. It follows that the associated or alternative expense for legal and accounting advice would also be a reasonably anticipated expense of the business for those years. See William C. Atwater & Co. v. Commissioner,10 T.C. 218 (1948). Respondent claims that because the amount of the accumulated earnings and profits tax was not specified in its notification it was unreasonable for petitioner to consider the proposed tax to be a contingent liability. It has been held that "a contingency is a reasonable need for which a business may provide, if the likelihood, not merely the remote possibility, of its occurence reasonably appears to a prudent business firm." Smoot Sand & Gravel Corp. v. Commissioner,241 F. 2d 197, 206 (4th Cir. 1957), *85 cert. den. 354 U.S. 922 (1957). While the amount of the proposed tax was unknown to petitioner at the time of the notification we cannot say that it was unreasonable for petitioner to have made an allowance for payment of the tax. The maximum tax could be readily ascertained by application of section 531. To accept respondent's contention that reasonable taxpayers should consider imposition of a tax liability to be merely a remote possibility under these circumstances would be to intimate that such notifications are indiscriminately mailed by respondent's agents. Moving, remodeling, or expanding the business
The management of petitioner was conservative in nature. Bill Baker established his separate business entirely with cash. Marie Baker and Johnnie Crouch also avoided the use of credit in capitalizing Marie's Shoppe. The financial records in evidence substantiate the absence of borrowing on behalf of petitioner. Therefore, it was not out of character for petitioner to accumulate amounts necessary to fund its future capital needs. John P. Scripps Newspapers v. Commissioner,44 T.C. 453 (1965). Petitioner maintains that a part of its earnings and profits were accumulated *86 to fund anticipated moving, remodeling or expansion of the business. Though each of these contingencies could qualify as a business need, to do so requires specificity as to the projected plans. Barrow Manufacturing Co. v. Commissioner,294 F. 2d 79 (5th Cir. 1961); Income Tax Regs. section 1.537-1(b). Though petitioner had expectations of moving, remodeling or expanding the business no specific plans were formulated. Neither does petitioner have a history of constant growth that would, without specific plans, support a reasonable belief that expansion is imminent. John P. Scripps Newspapers v. Commissioner,supra.
On the other hand, the alteration of downtown Grand Prairie was contemplated as early as 1966. From the start, petitioner had reservations relative to the effect that the downtown improvement project would have on business. The Bakers investigated a comparable project in Waco, Texas. The economic effect of that project was less than encouraging. Petitioner's pessimism as to the future of downtown Grand Prairie has not proved to be entirely unwarranted. Though petitioner's economic position has remained constant 13 companies have vacated the 100 block of West Main *87 Street since 1966. The buildings in that block remained vacant as of July 1, 1975. In the downtown area there has been a 60 percent loss of business. The consensus of the Grand Prairie businessmen is that the lack of on-street parking and the blockage of their display windows by the large sidewalk planters creates a Maginot Line which deters customers. The upheaval in downtown Grand Prairie was especially threatening to petitioner considering the character of its clientele. Petitioner is a ladies' dress shop. At times the store's front entrance was served by a temporary boardwalk suspended over the construction of the new sidewalk. In addition, petitioner was the only business with a rear exit. Because the on-street parking was disrupted and the sidewalk was dismantled there was a period during which construction workers and others traipsed through the store. To counteract the negative effects of this situation petitioner had to engage in a telephone campaign to attract customers.
Planning for the downtown projects was initiated in 1969 and extended into 1972. Work on these projects commenced in 1971 and terminated in early 1975. Between the initial planning stage and the *88 completion of these projects the value of petitioner's business site was questionable. If petitioner did weather the downtown projects the business premises would still need remodeling. Remodeling would cost an estimated $65,000 in contrast to an estimated $100,000 for moving. The difference in estimated costs is only $35,000.In view of the obvious uncertainties of the conditions in downtown Grand Prairie we are not going to substitute our judgment for that of the management of the business and find that petitioner should have limited its accumulations to the cost of remodeling as contrasted with the cost of moving when the facts and circumstances then known supported its decision. Faber Cement Block Co., Inc. v. Commissioner,50 T.C. 317 (1968). The time and expense necessary to formalize the alternative plans to cover the various contingencies due to the downtown upheaval would have been wasteful. Petitioner could not remain in limbo indefinitely; however, under the circumstances herein petitioner's wait-and-see stance was not unreasonable. While the facts herein make for a close case we feel we must find for petitioner on this issue. Petitioner's lack of specificity, while *89 making the task of fact-finding more difficult, is not determinative where the underlying circumstances and the objective manifestations of petitioner's intent uniformly support its assertion. See, Motor Fuel Carriers, Inc. v. Commissioner,559 F. 2d 1348 (5th Cir. 1977).
Respondent criticizes the lack of calculations by petitioner for the cost of moving, expansion or remodeling.[11] Upon respondent's request petitioner supplied estimates of these costs based on materials available at that time. Respondent does not contend that these estimates are either incorrect or unreasonable. Petitioner is a closely held corporation and, as such, cannot be held to the same strict formalities as a large public corporation. Duke Laboratories, Inc. v. Commissioner,222 F. Supp. 400 (D. Conn. 1963), affd. 337 F. 2d 280 (2d Cir. 1964). Working capital
The retention of earnings and profits as a source of working capital is not unreasonable where a need for such working capital exists. Income Tax Regs. section 1.537-2(b) (4). *90 In the past a rule of thumb existed that an accumulation of earnings and profits in an amount capable of meeting operating expenses for 1 year was reasonable. Petitioner's accumulation falls within this criterion.However, the trend is to consider such rules of thumb as mere administrative convenience. Barrow Manufacturing Co. v. Commissioner,supra.
More recently, under the Bardahl formula, working capital needs of a business have been measured for one operating cycle rather than for 1 taxable year where the nature of the business does not require a working capital reserve capable of funding 1 year's operations. Bardahl Manufacturing Co. v. Commissioner,T.C. Memo. 1965-200. Petitioner has a moderate turnover rate for its inventory which is generally sold for cash. The predominance of cash sales minimizes the time required for collection of accounts and the possibility of bad debt losses. The liquid character of petitioner's assets provides for readily available operating funds. Therefore, we find that for petitioner's business needs during the taxable years in question, one business cycle is the proper measure for reasonable accumulations to fund working capital needs. Barrow Manufacturing Co. v. Commissioner,supra. *91 However, before applying a mathematical formula, circumstances pertinent to the operating cycle must be considered. When a business has inventory peaks during the year it is not unreasonable for the business to measure working capital needs using its peak inventory figure rather than using an average inventory figure. Magic Mart, Inc. v. Commissioner,51 T.C. 775 (1969). Respondent, prior to calculating the amount of excess earnings and profits retained by petitioner failed to inquire whether petitioner had such peaks. After testimony concerning petitioner's estimated peak inventory was introduced respondent denounced petitioner for estimating the amount of the peak rather than having actual figures. Petitioner uses specific identification to establish inventory value. This method complies with section 471 by clearly reflecting income and conforming to the best accounting practice in petitioner's trade or business. It is impracticable to run such tabulations monthly. Respondent did not present evidence that such estimation was unreasonable. Petitioner explained that one reason for such peaks was the higher cost for fall clothes compared to that of spring and summer stock. We *92 find petitioner had peak inventory costs of approximately $85,000.When this figure is injected into the Bardahl formula the working capital needs of petitioner for the relevant years are as shown in column 4 of our table, supra. We held in W. L. Mead, Inc. v. Commissioner,T.C. Memo. 1975-215, affd. 551 F. 2d 121 (6th Cir. 1977), that the Bardahl formula should be applied using average rather than peak figures if the peak occurred in accounts receivable rather than in the cost of inventory. Therein, petitioner had not justified its position that longer periods of time were required to collect the larger amounts of accounts receivable. Herein, the peak figures relate to inventory cost. Petitioner has consistently paid its accounts payable promptly to take advantage of the 8 percent prompt payment discount. Thus, the inventory peak causes a peak in accounts payable in turn requiring a larger amount of available cash. Therefore, we find that working capital needs of petitioner should be computed using the peak period figures. Respondent contends that because petitioner's sales are normally for cash the amount of sales should increase parallel with the increase in inventory costs, *93 therefore, the peak in inventory is immaterial to the amount of working capital needed. We agree that, theoretically, the parallel increases should not increase the time required to sell the inventory. However, the inventory peak affects the rate of inventory turnover not the turnover rate for accounts receivable. [12] *94 The inventory must be paid for within 2 weeks to receive the 8 percent discount. Because working capital amounts are needed in advance of sales the larger working capital must accrue prior to that time. When inventory peaks exist it takes longer to accumulate the needed working capital. Thus, whether the sales are for cash or credit affects not the inventory turnover rate but the time it takes petitioner to collect its accounts receivable. No argument has been made that there are peaks in the accounts receivable causing an extended collection period. At the beginning of the taxable period in issue petitioner had already accumulated the minimum credit allowable under section 535(c)(2). Petitioner could, with impunity, only accumulate earnings and profits up to the amount of its reasonable anticipated needs. [13] As can be seen from the summary table set forth in our findings of fact petitioner's total accumulations were not in excess of these needs. Section 533(a) provides that, if such accumulations are found to occur, a presumption arises that the purpose of such accumulations *95 was to avoid the income tax with respect to its shareholders. To rebut this presumption the corporation must prove to the contrary by a preponderance of the evidence. Petitioner asserted that the purpose of the accumulation was to provide capital for continuation of the business in case the major shareholder succumbed to illness; for moving, expanding or remodeling the business; to meet contingent liabilities; and to cover working capital needs. We have found on the facts that the accumulations were not needed for continuation of the business but that they were retained for moving, expanding or remodeling the business. See Young Motor Co. v. Commissioner,339 F. 2d 481 (1st Cir. 1964). We have also found a need for accumulations for the latter two purposes. Thus, even if petitioner's accumulations were found to be beyond its reasonably anticipated needs its purpose for such accumulations was to ensure the perpetuity of the business in light of the economic conditions in downtown Grand Prairie. Knowledge of the tax consequences "did not contribute to the decision to accumulate earnings." United States v. Donruss Co.,393 U.S. 297, 309 (1969); Commissioner v. Shaw-Walker Co.,393 U.S. 478 (1969). *96 Decisions will be entered for the Petitioner. Footnotes
1. Sec. 532, I.R.C. 1954↩.
2. Respondent interchanges the amount of retained earnings with that of accumulated earnings. Petitioner does not question this figure's accuracy. Therefore, solely for the issue considered herein, we use the terms interchangeably. ↩
3. The retained earnings figure for 1971 has been increased by an audit adjustment not in issue less the applicable income tax.↩
4. Respondent, when calculating current assets for 1971, excluded a loan to a stockholder. For the taxable years 1972 and 1973 respondent included this same loan in the current asset computation. Though the loan remained outstanding until 1975 it was in the amount of $319.74 and more accurately fits into the current asset category due to the nature of the asset. Nemours Corporation v. Commissioner,38 T.C. 585 (1962), affd. per curiam 325 F. 2d 559 (3d Cir. 1963); Whitney Chain and Manufacturing Co. v. Commissioner,3 T.C. 1109 (1944), affd. per curiam 149 F. 2d 936↩ (2d Cir. 1945). 5. Taken from Form 1120, Schedule L, line 17. The figure consists of accrued payroll taxes, accrued sales taxes and accrued Federal income taxes. Respondent accepted this figure in his calculations.
6. Assets less accumulated depreciation.↩
7. Estimated expense for moving petitioner's business to a new location. ↩
8. Moving expense, plus 27.5 percent of $25,015.13 = 6,879.16 (see sec. 531(1)) and associated professional fees arbitrarily estimated at $3,120. * ↩
1971
1972
1973
85,000 / 157,096.18
85,000 / 165,259.36
85,000 / 181,623.86
=.5411
=.5143
=.4680
.5411 X 365 = 197
.5143 X 365 = 188
.4680 X 365 = 171
22,407.92 + 18,473.22 =
18,473.22 + 19,980.54 =
19,980.54 + 20,242.91 =
40,881.14
38,453.76
40,223.45
40,881.14 / 2 = 20,440.57
38,453.76 / 2 = 19,226.88
40,223.45 / 20,111.73
20,440.57 / 271,270.49
19,266.88 / 261,772.85
20,113.73 / 298,382.76
=.07535
=.0734
=.0674
.07537 X 365 = 28
.0734 X 365 = 27
.0674 X 365 = 25
11,181.07 + 10,259.21 =
10,259.21 + 9,720.72 =
9,720.72 + 10,245.08 =
21,440.28
19,979.93
19,965.80
21,440.28 / 2 = 10,720.14
19,979.93 / 2 = 9,989.96
19,965.80 / 2 = 9,982.90
10,720.14 / 155,878.58
9,989.96 / 149,149.99
9,982.90 / 168,811.93
=.06877
=.0669
=.0591
.06877 X 365 = 25
.0669 X 365 = 24
.0591 X 365 = 22
197 + 28 - 25 = 200
188 + 27 - 24 = 191
171 + 25 - 22 = 174
200 / 365 =.5479
191 / 365 =.5233
174 / 365 =.4767
.5479 X 255,627.45 =
.5233 X 250,352.58 =
.4767 X 289,751.32 =
140,058.27
131,009.50
138,124.45
9. SEC. 531.IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of-- (1) 27-1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38-1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule.--The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose.--For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. SEC. 534. BURDEN OF PROOF. (a) General Rule.--In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall-- (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary.--Before mailing the notice of deficiency referred to in subsection (a) the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. (c) Statement by Taxpayer.--Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition.--For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b) minus * * * the accumulated earnings credit (as defined in subsection (c)). (b) Adjustments to Taxable Income.--For purposes of subsection (a), taxable income shall be adjusted as follows: (1) Taxes.--There shall be allowed as a deduction Federal income and excess profits taxes * * * accrued during the taxable year * * *. * * *
(c) Accumulated Earnings Credit.-- (1) General Rule.--For purposes of subsection (a), in the case of a corporation * * * the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business * * * (2) Minimum Credit.--The credit allowable under paragraph (1) shall in no case be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year. SEC. 537. REASONABLE NEEDS OF THE BUSINESS. For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.↩
10. Subsequent to our ruling the Fifth Circuit Court of Appeals held that sec. 534 merely requires a statement that would put respondent on notice as to the basis behind petitioner's claimed need for retention of its earnings. Motor Fuel Carriers, Inc. v. Commissioner,559 F. 2d 1348↩ (5th Cir. 1977). While this criterion appears to be at variance with our ruling our final outcome is unaffected because petitioner has carried its burden.
11. Respondent also criticizes as self-serving petitioner's minutes of its directors' meetings. This is not a profound statement. Such minutes if made with any business acumen will normally be supportive.↩
12. The Bardahl formula is calculated as follows: (1) calculate the rate of turnover for inventory - average (or peak) inventory, divided by cost of goods sold, multiplied by 365; add thereto (2) the number of days it takes petitioner to collect its accounts receivable - average accounts receivable, divided by sales, multiplied by 365; subtract therefrom (3) the number of days it takes petitioner to pay its current liabilities - average accounts payable, divided by purchases, multiplied by 365; (4) the resulting figure is divided by 365 to reach the percentage of the year needed for one operating cycle; (5) reasonably anticipated working capital needs are then found by using this time period multiplied by the actual operating expenses for the year including cost of goods sold and Federal income taxes.↩
13. It must be noted that in so finding we overrule Farmers and Merchants Investment Co. v. Commissioner,T.C. Memo. 1970-161 regarding the method used to calculate the sec. 535↩ credit.