YATES PETROLEUM CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Yates Petroleum Corp. v. Commissioner
Docket No. 2729-91
United States Tax Court
T.C. Memo 1992-146; 1992 Tax Ct. Memo LEXIS 156; 63 T.C.M. (CCH) 2347; T.C.M. (RIA) 92146; March 12, 1992, Filed *156 Karl Norman Clifford and Stephen J. Stone, for petitioner. Martin M. Van Brauman, for respondent. BEGHE
BEGHE
MEMORANDUM OPINION BEGHE, Judge: This opinion addresses respondent's motion under Rule 142(e)[1] to allocate the burden of proof on the reasonableness of petitioner's alleged business needs for accumulated earnings tax purposes. Respondent determined that petitioner was liable for the accumulated earnings tax imposed by section 531 for the fiscal year ended March 31, 1988, in the amount of $ 5,281,073. Petitioner contends that its reasonably anticipated business needs exceeded its accumulated earnings, and that therefore it does not owe any accumulated earnings tax. The reasonableness of petitioner's claimed business needs will be the primary issue in any trial of the merits of this case. If those needs exceed accumulated *157 taxable income (after adjustments under section 535(b)), petitioner will owe no tax; if they do not, petitioner nonetheless will be able to reduce its accumulated taxable income by the amount of reasonable accumulations. Sec. 535(a), (c). Contrary to ordinary Tax Court practice under Rule 142(a), respondent has the burden of proof on the issue of the reasonableness of the accumulations if either of two conditions is satisfied, sec. 534(a): first, if respondent fails to issue a notification to the corporation, prior to the issuance of any notice of deficiency, that respondent proposes to issue a notice of deficiency based upon the accumulated earnings tax, sec. 534(b); and second, if the corporation files with respondent a timely statement "of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies" to establish that the accumulations were for reasonable business needs, sec. 534(c). In this case, prior to the issuance of the notice of deficiency, and in accordance with section 534(b), respondent issued a notification to petitioner that respondent intended to issue a notice of deficiency that would be premised, in whole or part, on the *158 accumulated earnings tax. Petitioner submitted a timely statement under section 534(c) (the statement). Respondent issued a notice of deficiency in accumulated earnings tax, and petitioner filed a timely petition with this Court. The only disputed issue on this motion is the sufficiency of the statement submitted by petitioner. Either party may move, under Rule 142(e), for the Tax Court to fix the burden of proof on the issue of the reasonableness of petitioner's accumulations. Respondent has so moved and it is appropriate to decide the Rule 142(e) motion at this time. Chatham Corp. v. Commissioner, 48 T.C. 145, 146 (1967); compare Shaw-Walker Co. v. Commissioner, 39 T.C. 293 (1962). We frequently have quoted Professors Bittker and Eustice to the effect that the statement: must constitute more than mere notice of an intent to prove the reasonableness of the accumulation. Rather, the taxpayer must show its hand by stating clearly and specifically the grounds on which it will rely to prove reasonable business needs and by setting out the facts (not the evidence, but more than conclusions of law) that, if proven, support the alleged *159 business needs for the accumulation. [Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.08, at 8-28 (5th ed. 1987) (same passage from 4th ed. 1979 quoted in Hughes, Inc. v. Commissioner, 90 T.C. 1, 17 (1988), and Rutter v. Commissioner, 81 T.C. 937, 939 (1983)).]
While the corporation's statement must "show its hand" and disclose the corporation's litigation theory to respondent, the statement "must outline only the basic facts necessary to notify respondent of the bases of the grounds asserted." Soros Assoc. Intl., Inc. v. Commissioner, T.C. Memo. 1982-79. "The taxpayer corporation is not required to state facts sufficient to meet a burden of proof which it may never have." Id. The Fifth Circuit has held that: the statement simply serves a notice function. Whether the "grounds" divulged in the statement subsequently prove convincing is irrelevant to this function. * * * But just as the statement is not supposed to be legally sufficient on the question of definiteness, neither is it supposed to be a substitute for testimony at trial. * * * [Motor Fuel Carriers, Inc. v. Commissioner, 559 F.2d 1348, 1352 (5th Cir. 1977), *160 revg. T.C. Memo. 1975-296; citations omitted.]
The Fifth Circuit later explained that the "notice function" is not satisfied "if the taxpayer merely gives notice in general terms * * *. To satisfy its 'notice function,' the sec. 534 statement must contain sufficiently detailed factual allegations supporting the grounds." J.H. Rutter Rex Manufacturing Co. v. Commissioner, 853 F.2d 1275, 1283 (5th Cir. 1988), affg. 81 T.C. 937 (1983) on this issue. The facts must be "substantial, material, definite, and clear." Id.; see also Thompson Engineering Co. v. Commissioner, 80 T.C. 672, 693 (1983), revd. on another issue 751 F.2d 191 (6th Cir. 1985); Bohac Agency, Inc. v. Commissioner, T.C. Memo. 1971-228. The purpose of the statement is to provide respondent with "a sufficiently clear idea of how the taxpayer planned to proceed at trial." J.H. Rutter Rex Manufacturing Co. v. Commissioner, supra at 1284; see also Motor Fuel Carriers, Inc. v. Commissioner, supra at 1352. We consider each ground in the statement separately. *161 As a result, we may impose the burden of proof on respondent with respect to some grounds and on petitioner with respect to other grounds. Hughes, Inc. v. Commissioner, supra at 18; Soros Assoc. Intl., Inc. v. Commissioner, supra.Petitioner will also have the burden of proof with respect to any grounds or amounts not mentioned in the statement. Sec. 1.534-2(a)(2), Income Tax Regs.
If petitioner's statement with respect to a particular ground provides support for petitioner's assertion that some accumulation was reasonable, but fails to provide sufficient facts to support the full amount of the accumulation, then we will impose the burden of proof on respondent only to the extent the supporting facts are sufficiently disclosed. Petitioner will have the burden of proof for amounts in excess of those supported in the statement. Rule 142(a); Soros Assoc. Intl., Inc. v. Commissioner, supra.
For the purposes of ruling on respondent's Rule 142(e) motion, we will state the facts in Yates' statement as if they were true. Soros Assoc. Intl., Inc. v. Commissioner, supra. It should be borne *162 in mind that we do so to avoid awkwardness in statement, and that we are not making findings of fact at this time. Chatham Corp. v. Commissioner, supra at 147. The grounds for petitioner's accumulations can be categorized by the two different methods used to explain the accumulations. For some grounds, petitioner has provided management's best estimate of reasonably anticipated expenditures. If the facts disclosed in the statement are sufficiently substantial, material, definite, and clear to permit respondent to prepare for trial, we will deem the statement sufficient as to these grounds. Respondent may carry her burden of proof at trial by showing, e.g., that no estimate in fact was made as of the close of a particular fiscal year, or that the estimate was disproportionate to what was reasonably necessary for petitioner's business, or that petitioner's asserted need was too speculative to be reasonably anticipated. Respondent has argued that these potential trial theories are reasons to find the statement insufficient. It is well established that these arguments are more suitably left for trial. Chatham Corp. v. Commissioner, supra at 147; *163 K&R Delivery, Inc. v. Commissioner, T.C. Memo. 1987-618. On certain other grounds, petitioner's statement relies on formulae to show the reasonableness of the accumulation. For instance, as will be explained in more detail below, petitioner claims that exploration costs are a function of the times and amounts of expiring acreage. On these grounds, petitioner will have made a sufficient disclosure if it states the formula (whether expressed algebraically or in plain English) relied upon for determining an anticipated need, sufficient data to use the formula, and the end result of the formula. Respondent may meet her burden of proof at trial if she shows by a preponderance of the evidence, e.g., that the formula itself is unreasonable, or that the data are inaccurate or unrealistic. Petitioner Yates Petroleum Corp. has its principal place of business in Artesia, New Mexico. Yates is engaged primarily in oil and gas exploration and production. Yates also has a farm and ranch business. Yates' statement asserts that at the end of the fiscal year 1988, it had reasonably anticipated business needs totaling approximately $ 353.2 million. We address individually *164 each of the grounds asserted by petitioner as reasonable business needs. 1. West Loco Hills Unit
Yates claims that it reasonably anticipated $ 30.4 million in costs associated with a "tertiary recovery" program at its West Loco Hills Unit in Eddy County, New Mexico. Respondent has made no concession on this ground. The Loco Hills field yielded 9.5 million barrels of oil between 1939 and 1963. During this period, only "primary" recovery methods were used; that is, wells were drilled and oil was pumped out. From 1963 to mid-1985, another 13.9 million barrels was recovered by pumping water into the wells, forcing oil out. This is known as "secondary" recovery. By the late 1970's, Yates believed secondary recovery was reaching its economic limits. Yates contemplated injecting carbon dioxide (CO[2]) into the wells to force even more oil out of the field. Although this method of recovery required substantial testing to determine its feasibility, oil was selling for more than $ 30 per barrel at the time, so Yates believed the project could be economically feasible. In April 1984, Yates, which until then had only a working interest in West Loco Hills, purchased the operator's *165 interest in the unit. At the time, crude oil sold for $ 29 per barrel. Yates' purchase was motivated in part by the unwillingness of the prior operator, Newmont Oil Co., to fully support the proposed tertiary recovery program. Following the buyout, Yates owned 87 percent of the working interest in the unit. However, as operator, Yates would have been required to advance 100 percent of the cost of a project, and then seek reimbursement from other working interest owners for their 13 percent pro rata share of the costs. Yates conducted a study of the feasibility of tertiary recovery in West Loco Hills. In October 1985, the completed study recommended going forward with the project. A copy of this lengthy and professionally done study was included in Yates' statement. Yates worked on the CO[2] project from December 1985 until oil prices fell precipitously. By April 1986, oil was selling for $ 12.35 per barrel. Yates halted the project and at that time determined that oil prices would have to rise to $ 25 per barrel for the project to be economically feasible. In January 1988, Big Three Industries announced it would build a CO[2] pipeline within 15 miles of the West Loco Hills *166 Unit. Between January and March 1988, Yates reevaluated the economics of the tertiary recovery project. Yates inquired into the cost of building a pipeline between the Big Three pipeline and West Loco Hills, as well as the cost of CO[2]. Although CO[2] was cheaper than it was assumed to be in the October 1985 feasibility report, Yates continued to delay the project until after March 31, 1988, the end of its 1988 fiscal year, because of low oil prices. The worst case scenario in the October 1985 feasibility study was a loss of $ 10.5 million after 10 years, discounted to a present value $ 7.9 million. The study assumed an initial price of oil of $ 26 per barrel, with oil prices rising by 7 percent annually. In its statement, using actual oil prices between 1986 and 1989, and $ 20 per barrel thereafter, Yates projected a negative $ 14.7 million cash flow at the end of 4 years and a negative $ 30.4 million cash flow at the end of the 10th year. We hold, for several reasons, that Yates' statement is insufficient to place the burden of proof on respondent on this ground. First, Yates provides no underlying data for its 1988 projections. The only cost data are from the 1985 study. *167 The updated data relied upon in 1988 were not included in the statement. Second, the data relied upon also appear suspect. Yates made its projection using oil prices between 1986 and 1989. But the price of oil after March 31, 1988, would not have been available to the company at the time the final decisions for 1988 dividends were made. Data that did not exist until after the close of the fiscal year might be used to show the reasonableness of management's projections of those data. But such data cannot be used to form the basis of those "projections". Third, the statement does not disclose the formula used to reach the projections. That is, it does not describe how the facts disclosed justify the accumulation. In particular, we note that Yates failed to discount the cash flow to net present value, as the 1985 study did. Fourth, Yates does not disclose the upside expectations, or even if there were any. If it appeared on March 31, 1988, that it would be impossible to earn a profit on the project, it would have been unreasonable to accumulate earnings for it, because it would not have been undertaken. Petitioner has the burden of proof on this ground. 2. Eagle Creek *168 Waterflood/Infill Drilling
Yates claims it was reasonable to accumulate $ 20 million to enhance the yield of the Eagle Creek Field in Eddy County, New Mexico. Respondent has made no concession on this ground. Eagle Creek accounted for 35 percent of Yates' wells and 13 percent of its total oil production. Yates describes the field as a "shallow, thick, tight dolomite oil reservoir." Because of this configuration, no more than 8 percent of the oil in place could be removed by primary production techniques. Yates actively considered waterflooding, and undertook a pilot project in the Eagle Creek Field costing $ 771,500. The cost of a field-wide waterflood would have been $ 7.5 million. If the pilot waterflood was unsuccessful, Yates' alternative plan was to use "infill drilling", which would have cost $ 20 million. Yates also became interested in a new form of tertiary recovery known as "Huff 'N Puff" CO[2] injection. The Huff 'N Puff concept originated in the early 1980's, and in 1986 and 1987 several papers on the topic were published. Although unproven, Huff 'N Puff offered several advantages over waterflooding. Field-wide Huff 'N Puff CO[2] injection would have cost *169 $ 10 million. As of March 31, 1988, no secondary or tertiary recovery program was economically feasible. However, Yates had always followed a business philosophy of financing its capital needs with earnings and avoiding debt. Yates' statement notes the "boom and bust" nature of the oil business, and asserts that in order to be ready for the good times when oil prices are high, it must have cash on hand to implement secondary and tertiary recovery programs. Yates claims that in line with this philosophy and its expenditure liability of $ 20 million for infill drilling, it was reasonable to accumulate that amount. The statement discloses insufficient facts to place the burden of proof on respondent on this ground. Yates does not disclose in its statement the period of time over which the $ 20 million would be paid. Nor does Yates disclose how much revenue the proposed recovery plans would generate, or its projected cash flow position at any point in the future (as Yates did with the West Loco Hills project). The statement does not indicate whether the $ 20 million would be paid up front in one lump sum, or whether it would be paid in installments so as to generate income as well *170 as expenditures over time. We hold that petitioner has the burden of proof on this ground. 3. Other Waterflood Projects
Yates asserts that it was reasonable to accumulate $ 3,057,000 for other waterflood projects. Respondent has made no concession on this ground. At various times, Yates considered waterflood recovery of six fields, for a total cost of $ 3,057,000. Because of low oil prices during 1986-89, these projects were given a low priority. Only the projects for the Atoka (SA) and Tom-Tom fields appeared on the Yates engineering department's list of projects as of the end of fiscal 1988, and only as projects to be undertaken if time permitted. The total cost of the Atoka Field (SA) project was projected at $ 765,000, and the Tom-Tom field was projected at a total cost of $ 750,000. The remaining $ 1,542,000 accumulation applied to projects not on the engineering department's list of projects. With respect to the $ 1,515,000 accumulated for the Atoka and Tom-Tom fields, petitioner has disclosed sufficient facts to place the burden of proof on respondent. However, the remaining projects were not under active consideration. Petitioner has not disclosed facts *171 sufficient to show the reasonableness of the remaining $ 1,542,000 accumulation. We therefore hold that petitioner has the burden of proof with respect to the amounts in excess of $ 1,515,000 for potential waterflood projects. 4. Exxon La Barge Processing Plant
Yates asserts that $ 24.1 million was reasonably accumulated because of Yates' lawsuit against Exxon regarding the La Barge natural gas processing plant in Sweetwater County, Wyoming. Respondent has made no concession on this ground. The processing plant was to separate methane, CO[2], helium, sulfur, and other products from natural gas as it came out of the ground, so that the natural gas and other products could be marketed. To supply the plant, Exxon intended to develop three gas units leased from the Federal Government, including the Fogarty Creek unit. Yates owned a working interest in the Fogarty Creek unit and was a party to a 1975 development agreement with Exxon. Exxon demanded that each working interest owner either contribute to the expense of developing the gas units and building the La Barge plant or be bought out. The estimated capital cost of the first phase of the La Barge project was $ 1.339 *172 billion. Yates decided to participate in April 1984. Yates' pro rata share of the capital expenditures was $ 24.1 million. In July 1985, Exxon tried to cut Yates out of the La Barge project. Yates sued Exxon in the U.S. District Court for the Southern District of Texas in January 1986, alleging antitrust violations and asserting that Exxon had incorrectly computed Yates' share of the expenses. The suit was still pending on March 31, 1988. It subsequently was settled on confidential terms. Yates did not disclose those terms in its statement. Yates maintains that it was reasonable to expect that it might have to pay $ 24.1 million to Exxon on disposition of the lawsuit. The accumulation of earnings against the possibility of an adverse outcome of a pending lawsuit is a recognized reasonable business need. Steelmasters, Inc. v. Commissioner, T.C. Memo. 1976-324. Yates has disclosed sufficient facts to place the burden of proof on respondent with respect to this ground. 5. Gas Gathering and Pipeline Connection Costs
Yates asserts that $ 1.93 million was reasonably accumulated because of the cost of connecting Yates' natural gas wells to a natural *173 gas pipeline operated by Transwestern Pipeline Co. Respondent has made no concession on this ground. During the mid-1980's, the only way producers could market their natural gas was to sell it to a pipeline company, which would then sell it to third parties. Pipeline companies required gas producers to bear the cost of connecting the wells to the pipeline. Transwestern would not sell its transportation services to gas producers, so producers could not market their gas without building their own pipeline. Transwestern also refused to pay Yates enough for natural gas to justify the cost to Yates of connecting Yates' wells to the pipeline. By 1987, new Federal Energy Regulatory Commission regulations required Transwestern to transport natural gas for a fee. Yates had shut in approximately 140 wells during the period when Transwestern refused to pay Yates' price. After the new regulation, Yates started to reopen these wells and connect them to the Transwestern pipeline. As of March 31, 1988, Yates estimated that the cost of connecting the remaining wells to the pipeline was $ 1.93 million. Yates has disclosed sufficient facts to place the burden of proof on respondent with respect *174 to this ground. 6. Acquisition of Producing Properties
Petitioner asserts that $ 46,418,000 was reasonably accumulated to acquire properties that might produce oil or natural gas. Respondent has conceded that $ 20,333,289 was reasonably accumulated. Yates must constantly replace its depleted oil- and gas-bearing properties with new properties in order to remain in the oil and gas business. In so doing, Yates tries to buy properties at bargain prices during low points in the business cycle. These properties are auctioned to the highest bidder. Yates bid on a substantial number of properties with the intention of acquiring as many properties as possible. During the last 4 months of the fiscal year ending March 31, 1988, Yates made bids totalling $ 1,457,000 and was successful with respect to $ 1,418,000 of those bids. The company was considering bids on "many properties" at the end of fiscal year 1988, and in the following 6 months submitted bids totalling $ 67 million, and, in all of fiscal year 1989, $ 100 million. Yates has failed to disclose how many properties it was considering as of the end of 1988 and how much it was likely to bid for those properties. The *175 fact that Yates actually made bids of $ 100 million in the following year would lend credibility to a claim that it was considering making bids in that amount. If such a claim had been made in the statement, we might find that the statement was sufficient on this ground. See sec. 1.537-1(b)(2), Income Tax Regs. However, there is no factual basis in the statement for the claim that more than $ 46 million was reasonably accumulated even though, in hindsight, such an accumulation might have been reasonable. Respondent's concession as to $ 20,333,289 of the accumulation has mooted the burden of proof issue as to that amount. However, with respect to amounts in excess of $ 20,333,289 accumulated for the purpose of acquiring producing properties, we hold that petitioner has the burden of proof. 7. Lease Bonuses
Another way Yates acquired producing properties was by leasing the right to extract oil and gas. Yates asserts that $ 40 million was reasonably accumulated to pay so-called lease bonuses. Because of increased competition for leases and a general shortening of lease terms (to 5 years, from 10 years), Yates anticipated that its annual expenditures for lease bonuses would *176 double or triple by the early-to-mid 1990's. Yates paid lease bonuses as follows: Year
Lease Bonuses
1985
$ 4,789,516
1986
$ 4,890,635
1987
$ 3,164,639
1988
$ 3,752,149
1989
$ 8,115,809
1990
$ 6,293,647
Yates' statement provides ample data and an end result. But Yates fails to explain how these data support its assertion that $ 40 million was reasonably accumulated. The $ 40 million number might have been picked at random, for all we can tell from the statement. Therefore, the burden of proof on this ground remains with petitioner. 8. Lease Exploration and Development
Yates contends that it was reasonable to accumulate $ 109,966,907 for the purpose of drilling exploratory wells on leased acreage on which the leases were about to expire. Respondent has made no concession on this ground. Yates leases a considerable amount of unproven reserves. In what amounts to a "use it or lose it" rule, Yates must drill on the leased acreage during the primary lease term or lose the preferential right to renew the lease. Yates routinely drills exploratory wells to preserve its rights of first refusal. Yates represents that in 1985 it drilled 126 wells to protect its rights *177 in 153,635 acres. Yates thus drilled an average of one well per 1,219 acres. The average cost was $ 147,487 per well. Based on this formula, Yates projected its cost of protecting its rights in expiring leaseholds as follows: Expiring
No. of
Year
Acreage
Wells Cost
1986
393,520
323
$ 47,638,301
1987
353,550
290
42,771,230
1988
243,700
200
29,497,400
1989
281,980
231
34,069,497
1990
366,650
301
44,393,587
Total
1,639,400
1,345
$ 198,370,015
Yates "arbitrarily" discounted this number by 50 percent to account for either the depressed condition of the oil industry or the need to accumulate earnings for only 2.5 years of exploratory drilling. The number Yates ends up with is $ 99,185,007. Yates also claims that its share of the costs of exploratory drilling on leases in which it owns a working interest but is not the operator was projected to be $ 10,781,900. Yates actually drilled the following number of wells: Expiring
No. of
Year
Acreage
Wells Cost
1986
393,520
92
$ 12,663,357
1987
353,550
46
4,869,887
1988
243,700
70
8,965,971
1989
281,980
53
11,322,666
1990
366,650
84
21,697,615
Total
1,639,400
345
$ 59,519,496
*178 In addition, Yates participated in, but was not the operator of, the following exploratory wells: No. of
Year
Wells Yates' Share of Cost
1986
8
$ 4,300,455
1987
4
2,331,750
1988
7
3,271,024
1989
3
4,761,552
1990
8
4,573,553
Total
30
$ 19,238,334
At the end of 1988, Yates could reasonably anticipate drilling exploratory wells only on acreage where the leases would expire in subsequent years. Thus, accumulations that reflect "projected" exploration costs for leases that expired during 1986, 1987, and 1988 should not enter into the equation. For leases that were to expire in 1989 and 1990, Yates has disclosed facts sufficient to show that it expected to spend $ 34,069,497 and $ 44,393,587, respectively, for exploration. Yates concedes that these amounts should be discounted by 50 percent, for a total of $ 39,231,542. On the other hand, Yates has provided no formula or data that would support its projection of $ 10,781,900 for exploration of leases in which it held a working interest. It does not state the amount of acreage in this category, the average number of wells per acre, or the cost per well. Thus, with respect to the first $ 39,231,542 accumulated *179 for the purpose of exploratory drilling in fiscal years 1989 and 1990 of leases for which Yates was the operator, we hold that respondent has the burden of proof. Respondent assails petitioner's formula as "ludicrous", and if she can so prove, she will prevail at trial. However, we hold that the burden of proof remains with petitioner for amounts in excess of $ 39,231,542, including all amounts accumulated for the purpose of paying petitioner's share of the cost of drilling exploratory wells on leases in which petitioner held a nonoperating interest. 9. Acquisition of Farm and Ranch Properties
Yates claims that it reasonably accumulated $ 4.3 million to acquire farm and ranch properties. Respondent has made no concession on this ground. Yates decided in 1979 to diversify into ranching. As of the end of 1988, Yates was actively considering the purchase of a 300-acre farm near Artesia, New Mexico, for $ 300,000 and 17,000 acres of other land for $ 4 million. Upon further consideration, after the end of 1988, the plans to purchase the land were dropped. Petitioner has disclosed sufficient facts to place the burden of proof on respondent on this ground. 10. Plugging *180 Liabilities
Yates claimed that it was reasonable to accumulate $ 18.7 million to cover its liability for plugging abandoned wells. Respondent has made no concession on this ground. As an operator of oil and gas wells, Yates is required by State and Federal law to plug those wells at the end of their useful life. It costs approximately $ 20,000 to plug each well. For each well, Yates reserves an amount equal to the estimated percentage depletion of the well multiplied by $ 20,000. Thus, if a well was 50 percent depleted, Yates would reserve $ 10,000 for plugging costs. Based on this formula, Yates claims that an accumulation of $ 18.7 million for plugging liabilities was reasonable. Although we are inclined to believe that it was prudent to accumulate earnings for a plugging reserve, Yates does not disclose how many wells it was operating or how depleted the wells were in 1988. The $ 18.7 million reserve corresponds to 935 fully depleted wells, or 1,870 half-depleted wells. Respondent does not have sufficient data to prepare for trial. For the purpose of the statement, it might have sufficed to state the number of wells in operation and the average percentage depletion. *181 Petitioner does not even supply this information. We hold that the burden of proof remains on petitioner on this ground. 11. Dagger Draw Gas and Saltwater Disposal Facilities
Yates asserts that it reasonably accumulated $ 5 million to construct gas sweetening and saltwater disposal facilities at the Dagger Draw field. Respondent has made no concession on this ground. Yates operates oil wells in a field known as Dagger Draw. These wells also produce large quantities of "sour" natural gas (gas with too much hydrogen sulfide) and saltwater. In order to market the "sour" gas, it first must be "sweetened" by removal of the hydrogen sulfide. As of the end of fiscal year 1988, Yates was actively considering the construction of a sweetening plant and had engaged Trinity Consultants to help develop the plans. The estimated cost of the plant was $ 4.4 million. Yates subsequently received an air quality permit to build the plant and now is negotiating with several construction firms. The saltwater from oil wells must be injected back into the ground in such a way as to avoid contamination of fresh groundwater. Ordinarily the water is hauled off-site by truck, but Dagger Draw *182 created so much saltwater that it was not practical to haul the water. Yates developed a plan to build saltwater injection wells on the Dagger Draw site at a cost of $ 600,000. The injection wells subsequently were built for twice that cost. We hold that Yates has disclosed sufficient facts to place the burden of proof on respondent on this ground. 12. Transwestern Lawsuit
Yates claims it was reasonable to accumulate $ 18.5 million to cover contingent liabilities relating to the settlement of a lawsuit with Transwestern Pipeline Co. Respondent has conceded that the accumulation were reasonable to the extent of $ 10,325,000. Yates sued Transwestern Pipeline over its refusal to deal with Yates on a nondiscriminatory basis. As a result of the lawsuit against Transwestern, Yates received an $ 82 million settlement. If those proceeds were adjudicated to be from the sale of natural gas, then the owners of royalty interests in Yates-operated wells would be owed a royalty of 15.37 percent, or $ 12.6 million. Transwestern agreed to indemnify Yates for 75 percent of actual royalty payments, up to $ 9.45 million, but Yates would have to pay royalty owners first and seek reimbursement *183 from Transwestern. Respondent concedes that the $ 3.15 million difference was reasonably accumulated. Yates also believed that it might be subject to a $ 5.9 million severance tax if the settlement was determined to be the proceeds of the sale of natural gas. Respondent appears to concede that $ 7.175 million would have been a reasonable accumulation for this purpose. We do not understand why respondent's concession on this sub-ground exceeds petitioner's claim. Petitioner has disclosed sufficient facts to place the burden of proof on respondent on the royalty contingency ground. Petitioner provided respondent the data, the formula, and the end result of the formula. On the tax contingency ground, respondent appears to concede in full the reasonableness of the accumulation. The burden of proof on the tax contingency ground has been mooted by this concession. 13. Working Capital Needs
Yates contends that it reasonably accumulated $ 18,017,170 for working capital. Respondent has conceded in full the reasonableness of this accumulation, so that the burden of proof issue on this ground has been mooted. 14. Risks Peculiar to Oil and Gas Industry
Yates asserts *184 that it reasonably accumulated $ 10 million to cover risks peculiar to the oil and gas industry. Respondent has conceded the reasonableness of this accumulation in full, so that the burden of proof issue on this ground has been mooted. 15. Computer Conversion
Yates states that it reasonably accumulated $ 494,000 for a contemplated computer system conversion. Respondent has conceded the reasonableness of this accumulation in full, so that the burden of proof issue on this ground has been mooted. 16. Litigation Expenses
Yates asserts that it reasonably accumulated $ 1.5 million to cover the cost of litigating the Exxon La Barge suit (see item 4, supra p. 13). Respondent has made no concession on this ground. As of March 31, 1988, Yates was still prosecuting its lawsuit against Exxon over the La Barge project. Yates anticipated legal expenditures of $ 1.5 million arising out of this lawsuit, including trial. Yates eventually settled the lawsuit and paid $ 759,000 in legal bills. Yates has disclosed sufficient facts to place the burden of proof on respondent on this ground. This ground is not susceptible to the "formula" approach we have followed for many *185 of the grounds above. It is entirely appropriate and sufficient for petitioner to state its management's best estimate of the inevitable legal bill. On the other hand, if respondent can establish that Yates had not actually made any estimate of its anticipated legal bills as of March 31, 1988, or that its estimate was unreasonable, then respondent will prevail at trial. 17. Demand for Refund of Overpayment
As of March 31, 1988, Yates had received a demand for a refund of an overpayment for natural gas from Phillips 66 Natural Gas Co. in the amount of $ 751,142 attributable to alleged billing errors during the period 1979-86. Yates anticipated having to refund Phillips' money. We hold that petitioner has disclosed sufficient facts to place the burden of proof on respondent on this ground. Summary
The parties have the burden of proof on the various grounds in the statement as follows: Concessions Respondent
Petitioner 1.
West Loco Hills
-0-  -0-    $ 30,421,000
2.
Eagle Creek
-0-  -0-    20,000,000
3.
Other waterflood
-0-  $  1,515,000 1,542,000
4.
Exxon La Barge
-0-  24,100,000 -0-   5.
Pipeline connection
-0-  1,930,000 -0-   6.
Acq. of producing props.
$ 20,233,289
n/a    26,184,711
7.
Lease bonuses
-0-  -0-    40,000,000
8.
Lease exploration
-0-  39,231,542 70,735,365
9.
Acq. of farm & ranch props.
-0-  4,300,000 -0-   10.
Plugging liabilities
-0-  -0-    18,700,000
11.
Dagger Draw
-0-  5,000,000 -0-   12.
Transwestern lawsuit
(a) Royalty contingency
3,150,000
9,450,000
-0-   (b) Tax contingency
[2] 5,900,000
n/a    n/a   13.
Working capital
18,017,170
n/a    n/a   14.
Peculiar risks
10,000,000
n/a    n/a   15.
Computer conversion
494,000
n/a    n/a   16.
Litigation expenses
-0-  1,500,000 -0-   17.
Refund of overpayment
-0-  751,142 -0-   $ 57,794,459
$ 87,777,684 $ 207,583,076
*186 Amounts listed in petitioner's column are the difference between petitioner's claimed needs and the totals of the other two columns. The chart does not take into account the possibilities that petitioner will advance new grounds for accumulation at trial or that petitioner will attempt to show that accumulations greater than those disclosed in the statement were reasonable. In either of those situations, petitioner would have the burden of proof, regardless of whether a "-0-" or "n/a" appears in petitioner's column. An appropriate order will be issued. Footnotes
1. All Rule references are to the Tax Court Rules of Practice & Procedure. All section references are to the Internal Revenue Code as in effect for the fiscal year in issue.↩
2. As discussed supra↩ p. 23, respondent appears to concede that $ 7.175 million was reasonably accumulated for the severance tax contingency. We have found that respondent was merely conceding in full the reasonableness of the accumulation with respect to the tax contingency, which petitioner stated was $ 5.9 million.